2016 IL App (1st) 133497

FIFTH DIVISION
May 6, 2016

No. 1-13-3497

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10 CR 14728 |
| SYLVESTER BOSTON, | ) ) | |
| Defendant-Appellant. | ) ) ) | Honorable Charles P. Burns, Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Gordon and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Sylvester Boston was charged by indictment with possession of contraband in

a penal institution (720 ILCS 5/31A-1.1(b) (West 2010)).  The indictment specifically alleged he

possessed a shank that was discovered in his waist band while in the Cook County Department of

Corrections (CCDOC) on July 23, 2010.[1]  After a jury trial, defendant was found guilty of that

offense and was sentenced to five years' imprisonment.  On appeal, defendant contends the trial

---

[1] "Our supreme court has also recognized that a shank is a type of weapon, or specifically, a "homemade knife.' " *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 23 " '[a]fter the incident, officers found a homemade knife made of sharpened metal, called a "shank," in the recreation area' " (quoting *People v. Baez*, 241 Ill. 2d 44, 72 (2011)).

court erred when it failed to instruct the jury regarding the defense of necessity and that his right to present a meaningful defense was violated when the trial court limited or excluded certain evidence. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2                                         BACKGROUND

¶ 3     Defendant was charged with one count of possession of contraband in a penal institution for being found with a shank while incarcerated in the CCDOC on July 23, 2010.[2] Defendant filed an answer to discovery in which he stated he would be asserting the affirmative defense of necessity. Prior to trial, the State filed a motion *in limine* seeking to bar defendant from presenting the affirmative defense of necessity. The trial court determined it would not preclude defendant from presenting evidence in support of the necessity defense, but reserved ruling on whether the jury would be instructed on the defense based on what the evidence demonstrated.

¶ 4     At trial, the State presented the testimony of Officer James Gosling (Officer Gosling), a correctional officer in the Cook County sheriff's department. Officer Gosling testified that on July 23, 2010, at 2:45 p.m. he conducted a search of tier IE in division nine of the CCDOC. Tier 1E held 22 inmates, each in their own individual cell. Inmates in this division are "locked up 23 hours a day." When permitted, only one detainee at a time is allowed outside of his cell for a period of one hour. Inmates also shower alone. When allowed outside of their cells, inmates are perpetually supervised.

¶ 5     Officer Gosling testified that typically when conducting a search, the door of the cell is unlocked, the detainee is secured, patted down, and then seated in the day room area while officers search his cell. According to Officer Gosling, during a search he looks for "any sort of hazard" or "homemade weapons that could be used to injure" anyone in the jail.

_____

[2] Defendant was incarcerated waiting to be tried on a murder charge at the time the shank was discovered.

¶ 6      Regarding the search of defendant and his cell, Officer Gosling testified he instructed defendant to step out of his cell.  Defendant complied.  When defendant was secured with handcuffs, Officer Gosling proceeded to conduct a pat-down search of defendant.  In doing so, Officer Gosling discovered a "shank" in the waistband of defendant's boxer shorts on his right side that was approximately four to four and a half inches in length.  According to Officer Gosling, a "shank" is "a homemade weapon."  Such weapons are not allowed in the CCDOC.

¶ 7      On cross-examination, Officer Gosling testified that when he recovered the shank defendant stated "this is a bad place," implying that defendant possessed the shank to protect his life.  Officer Gosling further testified that in four years of daily shakedowns he has conducted, he has recovered four to five weapons.  He estimated, however, that during the same four years 50 shanks were recovered by the emergency response team.[3]  Officer Gosling did not know how long defendant had resided in tier 1E, but testified that in other tiers within division nine two inmates reside in one cell.

¶ 8      In addition, Officer Gosling testified that at times a detainee will utilize a "popper," a device used to defeat the locking mechanism on the cell door.  When this is accomplished a detainee can theoretically be able to "pop their door open," although Officer Gosling testified he had never personally witnessed a detainee perform this act.  Officer Gosling further testified that, at times, inmates are transported through the prison to be taken to court, for visitation, to consult with their attorney, or to obtain medical services.

¶ 9      Sergeant Brian Bialczak (Sergeant Bialczak) of the Cook County sheriff's department testified that on July 23, 2010, he was part of the emergency response team that searched

---

[3] According to Officer Gosling, an "emergency response team" is a team that "handle[s] *** any sort of emergency situation.  Whatever that would be.  Whether it be possibly a riot, if there was [sic] any sort of incidents where they would need us to search."

defendant's cell. Sergeant Bialczak provided testimony similar to Officer Gosling regarding the search procedures. Sergeant Bialczak observed Officer Gosling conduct the pat-down search of defendant and recover a shank from the waistband of defendant's underwear.

¶ 10    On cross-examination, Sergeant Bialczak described the shank discovered on defendant's person as "a piece of plastic with a point." Sergeant Bialczak testified he personally recovered more than ten shanks during his four years as a member of the emergency response team. Sergeant Bialczak estimated that he witnessed other officers recover 40 shanks. Sergeant Bialczak further testified that defendant was cooperative during the search. Sergeant Bialczak also testified similarly to Officer Gosling that a popper allows an inmate to jam their cell door and prevent it from locking when it is closed.

¶ 11    The State rested and defendant moved for a directed finding, which the trial court denied.

¶ 12    Robert Anderson (Anderson), an inmate currently incarcerated due to a murder conviction, testified on behalf of the defense as follows. In 2009, he was in custody in CCDOC and resided in tier 2B of division nine along with defendant. In spring of 2009, Anderson was in the day room watching television when he observed an individual, identified only as "L.C.," walking towards the restroom area. The restroom area was completely visible from the day room where Anderson was seated. Anderson observed L.C. approach defendant from behind and stab him in the shoulders and neck multiple times with an object resembling an ice pick. Defendant and L.C. began struggling and the altercation moved in front of the "officer's bubble" located just outside of the day room. In the meantime, other inmates stepped in and broke up the altercation, but shortly thereafter defendant and L.C. resumed fighting. No officer came to break up the altercation nor did any medical personnel attend to defendant. Anderson could not recall any other fights occurring between defendant and L.C.

¶ 13 Anderson further testified he was later moved to tier 1F and then to tier 1E. According to Anderson, tiers 1F and 1E were different from tier 2B because tiers 1F and 1E were for inmates who had problems stemming from protective custody issues due to disciplinary reasons. Tiers 1F and 1E consisted of single, individual cells with one inmate per cell. Inmates who resided on these tiers were only allowed out of their cells for one hour a day.

¶ 14 In addition, Anderson testified that in 2010 and 2011, when he resided in tier 2B at the same tier as defendant, he observed defendant being threatened. When asked about "poppers," Anderson testified that a popper is "an object that detainees often place in their cell doors to defeat the lock mechanisms and get out of his cell to attack another individual."

¶ 15 On cross-examination, Anderson testified he could not recall if he resided on the same tier as defendant on July 23, 2010. Anderson further testified tier 2B is a general population area where inmates could "hang out" together. Anderson also testified that in 2009, when he observed defendant being stabbed, he did not report what occurred to anyone at the jail. On re-direct, however, Anderson testified he did not report the stabbing "[b]ecause you can get killed."

¶ 16 Defendant next called Andre Mamon (Mamon) who, at the time of the trial, was incarcerated due to a murder conviction. Mamon testified as follows. In 2009, he resided in tier 2B of division nine with defendant. In early 2009, he was in the day room watching television. Defendant was in the restroom when a man, whose name Mamon did not know, approached defendant from behind and stabbed him. Mamon observed this individual stab defendant in the neck and upper body with a metal object approximately four to five inches long. The two began struggling and ended up outside of the officer's bubble in the day room. The fight was stopped, but three or four minutes thereafter a fistfight between defendant and the individual commenced near the stairs. According to Mamon, no officer put a stop to the fight. Mamon also testified

that a "popper" is "a little object that you could stick in the door to use to open your door" and that he observed inmates using poppers on tier 1E.

¶ 17    On cross-examination, Mamon testified he did not report defendant's stabbing to anyone and in 2010 he was not detained in the CCDOC.

¶ 18    Defendant testified on his own behalf as follows. At the time of trial, he was 28 years old. He first came to the CCDOC in June of 2006. Three or four months later he was "jumped" in the shower area by a man with the last name Munoz along with other unnamed individuals. As a result of this incident defendant was moved to division nine. In early 2009, he was residing on tier 2B when "[a] young man walked up to me and threatened me, and told me he was going to kill me and take my life, and I walked off from him, and he stabbed me in the back of the neck." Defendant tried to take the knife from him, and the two began to fight. The fight ended, but shortly thereafter the two got into a fistfight. Defendant did not receive medical attention for his wounds. Defendant identified the man who attacked him as Charles Lawson.

¶ 19    Defendant further testified that, as a result of being stabbed by Lawson, in late 2009 or early 2010, he was moved to tier 2E where he was stabbed by his cellmate, Virgil Daniels.

¶ 20    Defendant also testified that in early spring of 2010, he observed Lawson at the Markham courthouse. When asked if Lawson said anything to him, defendant replied, "He threatened me." The State, however, objected. The trial court sustained the objection. Defense counsel did not object to this ruling, nor did counsel make an offer of proof regarding what Lawson said to defendant. No further testimony was elicited regarding defendant's interaction with Lawson at the Markham courthouse.

¶ 21    Defendant admitted that on July 23, 2010, he had a shank in his possession, but stated it was because he "feared for my own life, and to protect myself." Defendant testified that he felt

he needed to protect himself because Munoz was now residing in the same division as defendant, but on a lower tier. Defendant further testified that "a day before the incident, on July 20th—in July" he and Munoz "had a conversation--just altercation--we just had a few words." No further questioning was had regarding defendant's altercation with Munoz.

¶ 22    On cross-examination, defendant testified he reported being jumped by Munoz in 2006 to Officer Calderone. Defendant also reported being stabbed by Lawson in 2009 to Officer Toby.[4] Defendant further testified that he was never alone when he resided on tier 1E, but would be accompanied by an officer. Defendant also testified he never asked to be placed in protective custody.

¶ 23    On redirect, defendant testified he interacts with inmates at the barber shop, the dispensary, when being moved on the tier, and during visitation. Defendant also testified he observed other inmates come out of their cells without the assistance of an officer. In addition, defendant testified that when an inmate was outside of their cell during their one hour of free time, they could approach another inmate's cell door.

¶ 24    The defense rested. In rebuttal, the State recalled Sergeant Bialczak as a witness. Sergeant Bialczak testified that defendant was moved to tier 1E on October 27, 2009. Sergeant Bialczak further testified that he worked on tier 1E between October of 2009 and July of 2010. According to Sergeant Bialczak, during this time defendant never expressed concerns for his own safety or a desire to be placed in protective custody. Sergeant Bialczak also testified that neither Anderson nor Mamon resided on tier 1E on July 23, 2010.

¶ 25    On cross-examination, Sergeant Bialczak testified that on July 23, 2010, Munoz resided on tier 1E. Sergeant Bialczak was not aware of any prior incidents between Munoz and

---

[4] The first names of Officers Calderone and Toby are not in the record on appeal.

7

defendant.

¶ 26    At the close of evidence, the trial court conducted a jury instruction conference outside the presence of the jury.  Defendant requested a necessity defense jury instruction.  After hearing arguments from the parties, the trial court denied the request.  The trial court noted that the evidence demonstrated the prior assaults on defendant occurred several months before hand.  The trial court also referred to defendant's "conversation" with Munoz the day before the shank was found to be "vague."  Although the trial court acknowledged that Lawson essentially threatened to kill defendant when they were at the Markham courthouse, the trial court concluded that "a mere verbal threat alone" is insufficient to justify a necessity defense.  The trial court was also not persuaded that the threats against defendant were "immediate" and, thus, did not meet the requirements under *People v. Kite*, 153 Ill. 2d 40 (1992).

¶ 27    After closing arguments, the jury commenced deliberating.  During deliberations, the jury sent out a note which stated, "Are we allowed to consider self-defense, underlying self-defense, in the instructions?"  The trial court responded, "You have the instructions of law.  You heard the law, please continue to deliberate."

¶ 28    The jury subsequently found defendant guilty of possessing contraband in prison.  When polling the jury, one juror indicated he found defendant guilty, however, he also stated, "I don't like it.  I think the system failed him, but it is [my verdict]."  After polling was concluded, one juror addressed the court, stating:  "I think everyone on this jury found it very difficult to render this decision.  We feel Mr. Boston was justified in defending himself, but that was not the charge."

¶ 29    On October 26, 2012, defendant filed a motion for a new trial in which he asserted generally that he did not receive a fair and impartial trial.  Thereafter, on April 9, 2013,

8

defendant filed an amended motion for a new trial. Defendant maintained he did not receive a fair and impartial trial because the trial court erred: (1) when it allowed the State to admit the shank into evidence; (2) denied defendant's motion for a directed finding; (3) did not allow defendant to testify regarding his encounters with Lawson; and (4) denied the necessity defense instruction. The trial court denied defendant's motion and sentenced him to five years' imprisonment in the Illinois Department of Corrections. This appeal followed.

¶ 30                                ANALYSIS

¶ 31    On appeal defendant raises two contentions, the trial court erred when (1) it did not provide a necessity defense instruction to the jury; and (2) it impaired his ability to present a meaningful defense by preventing him from eliciting relevant evidence. We address each argument in turn.

¶ 32                          A. Necessity Defense

¶ 33    Defendant concedes he was in possession of a weapon while incarcerated in a penal institution, but argues he was justified due to the threats made against him. Defendant requests the court to vacate his conviction and remand for a new trial because the trial court erred in refusing to instruct the jury on his defense of necessity.

¶ 34    Generally, we review the trial court's refusal to issue a specific jury instruction under an abuse of discretion standard. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). Defendant notes, in *People v. Washington*, 2012 IL 110283, our supreme court decided that "whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review." *Id.* ¶ 19. But, the issue before the court in *Washington* concerned whether the evidence supported the giving of a jury instruction on self-defense and, if so, whether an instruction on second degree murder must be given as a mandatory counterpart.

*Id.* ¶ 56. Our supreme court did not address the differing standards for jury instructions nor did it overrule previous supreme and appellate court decisions that have applied a different standard. See *id.* ¶¶ 19-56. The *Washington* court further limited its holding to cases "where the trial court has determined that the giving of an instruction on self-defense is warranted and the defendant requests the giving of a second degree murder instruction." *Id.* ¶ 56.

¶ 35   We further note that in applying a *de novo* standard of review, our supreme court in *Washington* relied on *People v. Everette*, 141 Ill. 2d 147, 157 (1990). In that case, the question before our supreme court was whether the evidence in the record supported a jury instruction on self-defense. *Id.* at 156. In establishing the standard of review, the court stated, "It is a matter of law whether the defendant has met the evidentiary minimum entitling him to instructions on an affirmative defense." *Id.* at 157 (citing *People v. Lockett*, 82 Ill. 2d 546, 553 (1980)). The *Everette* court, in turn, relied on *Lockett* wherein our supreme court stated:

"It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable. The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable. So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable. Consequently, we hold that when the evidence supports submitting an instruction on justifiable use of force, a tendered IPI Criminal No. 7.05 on voluntary manslaughter also should be given." *Lockett*, 82 Ill. 2d at 553.

The language of *Lockett* does not support the *Everette* court's application of the *de novo* standard of review. *Lockett* merely provides that it is not within the province of a trial judge to "decide if defendant's subjective belief was reasonable or unreasonable." *Id.* The *Lockett* court explains that the trial judge's function is only to determine whether or not the defendant presented evidence of a subjective belief. *Id.* Whether that belief is reasonable or unreasonable is left to the jury to decide. *Id.*

¶ 36    In the case at bar, defendant is not asking us to review the trial judge's determination regarding whether defendant's subjective belief was reasonable or unreasonable. Instead, defendant asks us to review whether the trial court erred in failing to provide the necessity defense instruction to the jury. Such a question requires us to examine the record and determine whether the trial judge abused his discretion when making that determination. See *People v. Gibson*, 403 Ill. App. 3d 942, 950-51 (2010), *abrogated on other grounds*, *People v. Bailey*, 2014 IL 115459 (quoting *Jones*, 219 Ill. 2d at 31 in applying an abuse of discretion standard to the trial court's decision to refuse a necessity defense instruction).

¶ 37    Moreover, this court has recently explained that it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be tendered to the jury. See *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 46 (considering the proper standard of review where the defendant challenged the self-defense instructions provided to the jury). The *Cacini* court also noted that the question of whether there was sufficient evidence to support a jury instruction "is a question of fact, not of law, and thus is properly within the discretion of the trial court." *Id.* The abuse of discretion standard was also applied in the recent matter of *People v. Willett*, 2015 IL App (4th) 130702, ¶ 91. Regardless, as discussed herein, under either the *de novo* standard or the abuse of discretion standard, we reach the same result.

¶ 38     A defendant is entitled to an instruction on his theory of the case where there is some evidence to support the giving of the instruction. *Jones*, 219 Ill. 2d at 31; *People v. Unger*, 66 Ill. 2d 333, 338 (1977). "Although the threshold of evidence required to raise an affirmative defense is low, the defendant bears the burden to satisfy that requirement [citation], and where the defendant presents no supporting evidence, the proffered instruction should be refused [citation]." *Kite*, 153 Ill. 2d at 45; see *People v. Mohr*, 228 Ill. 2d 53, 65 (2008) (instructions which are not supported by the evidence should not be given).

¶ 39     The defense of necessity involves the following elements:  (1) the person claiming the defense was without blame in occasioning or developing the situation; and (2) the person reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might have reasonably resulted from his own conduct.  720 ILCS 5/7-13 (West 2010); *People v. Govan*, 169 Ill. App. 3d 329, 336 (1988).  The defense of necessity applies when the threat of harm was immediate, and defendant's conduct was the sole option to avoid injury.  *People v. Azizarab,* 317 Ill. App. 3d 995, 998-99 (2000); see *People v. Kratovil*, 351 Ill. App. 3d 1023, 1034 (2004) ("Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances." (citing *People v. Henderson*, 223 Ill. App. 3d 131, 136 (1991))).  This defense usually involves the choice between two admitted evils where other optional courses of action are unavailable, and "the conduct chosen must promote some higher value than the value of literal compliance with the law." *People v. Janik*, 127 Ill. 2d 390, 399 (1989).  "[T]he defense of necessity arises when a person reasonably believes his conduct, which would otherwise constitute an offense, was necessary to avoid a public or private injury greater than the injury which might have resulted from his conduct." *Kite,* 153 Ill. 2d at 46.

¶ 40    Here, because defendant was charged with possessing a weapon in a penal institution, our review of whether he presented some evidence to support a necessity instruction involves additional considerations. Accordingly, in this context we must consider whether: "(1) the prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (2) there is no time for a complaint to the authority or there exists a history of futile complaints which make any result from such complaint illusory; and (3) there is no time or opportunity to resort to the courts." (Internal quotation marks omitted.) *Id.* at 45 (quoting *People v. Tackett*, 169 Ill. App. 3d 397, 402 (1988)).[5] Although, the presence of every factor is not required for the establishment of a necessity defense, "[a] specific and immediate threat, however, constitutes the very nature of a necessity defense; thus, proof of that factor is a threshold requirement for its establishment." *Id.* Accordingly, the "[f]ailure to prove the existence of a specific and immediate threat obviates the need to conduct an inquiry into the second and third factors." *Id.* This is because, absent a specific and immediate threat, an inmate is not faced with a choice between avoiding a public or private injury greater than the injury which might have resulted from his conduct. *Id.* at 46.

¶ 41    Defendant asserts that the evidence demonstrated he received specific and immediate threats from Lawson and Munoz. Specifically, defendant maintains Lawson had told him in early 2009 that "he was going to kill me and take my life." Defendant points out that thereafter, Lawson acted on his threat by stabbing him in the neck. Defendant also asserts Lawson threatened him in spring of 2010 while they were both at the Markham courthouse. In addition,

---

[5] We note that since *Kite*, the statute under which that defendant was charged was amended by our General Assembly to prohibit the application of a necessity defense. See 720 ILCS 5/24-1.1(b) (West 2010). The statute under which defendant here was charged was not subsequently amended and, thus, still allows a defendant to assert a necessity defense. See 720 ILCS 5/31A-1.1 (West 2010).

defendant testified the day before the shank was discovered he had an "altercation" with Munoz where the two "had a few words."

¶ 42    The State contends that defendant failed to prove a specific and immediate threat warranting a necessity instruction.  The State relies on *Kite* in support of its argument.  In that case, the defendant, who was discovered with a weapon in September of 1989, testified that in 1987 his safety was threatened and, as a result, he was placed in a segregation yard where he was subsequently attacked.  *Kite*, 153 Ill. 2d at 43-44.  Thereafter, the defendant suffered two more assaults, but did not inform prison authorities.  *Id.* at 44.  On appeal, the defendant argued that "by demonstrating a 'continuing threat' the specific and immediate threat factor has been satisfied."  *Id.* at 46.  The *Kite* court rejected the defendant's assertion, holding "notwithstanding the continuing nature of a threat, absent the immediacy, as contemplated by the courts in *Unger* and in *Tackett*, the specific and immediate threat factor has not been satisfied.  Moreover, to demonstrate a continuing threat, the defendant would still have to provide some evidence that a specific and immediate threat existed, albeit over an extended period of time."  *Id.* at 46-47.  Our supreme court explained that the trial court properly refused to give the instruction where the "defendant's vague, uncorroborated testimony, coupled with the length of time between the alleged events, do not support a finding of a specific and immediate threat."  *Id.* at 47.

¶ 43    Similarly, in *Tackett* the defendant, an inmate at the Pontiac Correctional Center, was indicted for unlawful use of a weapon by a felon.  *Tackett*, 169 Ill. App. 3d at 399.  At the close of evidence, the defendant's request for jury instructions on the defense of necessity was denied.  *Id.* at 401.  Applying the same factors later adopted by our supreme court in *Kite*, the *Tackett* court agreed with the trial court's assessment of the evidence.  *Id.* at 402.  The *Tackett* court noted that the defendant "freely admitted possession of the shank, claiming it was necessary for

14

self-protection," but did not present "any evidence regarding a specific threat." *Id.* In addition, the court acknowledged that, "Although the defendant had suffered from gang violence in the past, there was no evidence of any imminent danger." *Id.* The evidence also demonstrated the defendant lived in "a one-man cell." *Id.* at 402-03. According to the *Tackett* court, overall "[t]he evils alleged by the defendant at trial were neither grave nor serious. The fact that the prison, and specifically the gangs, often present a dangerous situation does not justify the arming of inmates and is clearly insufficient to support a claim of necessity." *Id.* at 403.

¶ 44     Here, the evidence established defendant was attacked by Munoz in 2006, by Lawson in early 2009, and by his cellmate in either late 2009 or early 2010. Defendant presented the testimonies of Anderson and Mamon to corroborate his testimony regarding Lawson's attack. However, due to their remoteness in time, we find none of these attacks constitute a specific and immediate threat to defendant. Defendant also testified in spring of 2010, Lawson threatened him at the Markham courthouse. Although the State's objection to this line of testimony was sustained, we again find a threat which occurred months prior to the discovery of the shank was too remote in time to be an immediate threat. See *Kite*, 153 Ill. 2d at 45.

¶ 45     While defendant's claim that his "conversation" with Munoz the day before the shank was discovered was a specific, immediate threat, defendant's testimony reveals otherwise. First, defendant did not testify that he was threatened by Munoz. Defendant's complete testimony regarding this "conversation" was as follows: "I had a conversation--just altercation--we just had a few words." No other testimony was elicited that described the conversation and defendant never testified that Munoz threatened him during this exchange. Moreover, defendant did not present any evidence corroborating Munoz's alleged threat. See *id.*, 153 Ill. 2d at 47.

¶ 46     Second, even if the evidence revealed Munoz did threaten defendant, the threat was not

immediate. Defendant testified his "conversation" with Munoz occurred "a day before the incident, on July 20th—in July." Although the parties argued this "conversation" occurred the day before defendant was found with the shank, the record reveals that defendant's statement as to when the "conversation" occurred was inconsistent. On the one hand, defendant stated he "had a few words" with Munoz the "day before the incident," but in the next breath it changes to either three days before or sometime during the month of July. This statement lacks the required immediacy to warrant a necessity defense. See *cf. People v. Ferree*, 221 Ill. App. 3d 212, 217 (1991) (necessity defense was warranted where the threat was made "only an hour before defendant obtained the weapon"). Had the threat occurred the day prior, defendant would have had ample opportunity to alert the authorities of his safety concerns. Defendant disagrees and argues his prior attempts in 2006 and 2009 at alerting the authorities were futile. We note, however, that after defendant was beaten in 2006, he was moved to a different division. Similarly, in 2009 after he was stabbed by Lawson, defendant was placed in protective custody. Such a placement indicates that his reports were not futile, his safety was a concern to officers, and he was moved accordingly. Defendant did not encounter a situation where he made repeated reports to prison officials that went ignored. See *cf. People v. Musgrove*, 313 Ill. App. 3d 217, 219 (2000) (finding a necessity defense was warranted where the defendant reported the threats to the warden and the assistant director, filed a grievance that detailed his safety concerns, and wrote numerous letters regarding his safety concerns with no response). Thus, possessing a weapon was not defendant's sole reasonable alternative under the circumstances. See *Kratovil*, 351 Ill. App. 3d at 1034. Third, defendant failed to present any evidence regarding when he acquired or constructed the shank. The timing of such an acquisition could have shed some light on defendant's claim that he faced an immediate threat; however, no testimony was elicited that

as a result of the "altercation" with Munoz he acquired the shank. Accordingly, defendant presented no evidence of a specific, immediate threat which would warrant a necessity jury instruction.

¶ 47 In addition, defendant failed to present any evidence that no reasonable alternatives were available but for him to possess the shank. Defendant did not present any evidence that he attempted to alert the authorities about Munoz's threat nor did defendant present evidence that past attempts to alert the authorities were futile. In fact, as discussed previously, even if the threat occurred the day before the shank was discovered, he had ample opportunity to alert the authorities from the safety of his own cell. See *Unger*, 66 Ill. 2d at 342 (the defendant could have informed the authorities of his situation after securing a position of safety). Furthermore, because defendant failed to present evidence of an immediate threat, he failed to establish that it was necessary for him to break the law in order to avoid a greater harm. Accordingly, we conclude the trial court did not abuse its discretion when it declined to provide the necessity instruction to the jury.

¶ 48 We further find defendant's reliance on *Ferree* to be misplaced. Defendant contends that under *Ferree* the beatings and stabbings he suffered at the hands of Munoz, Lawson, and Daniels provide support that a necessity jury instruction was required. According to defendant, "Where this Court [in *Ferree*] has considered an attack in a completely different prison persuasive in finding a necessity instruction to be due, an attack which occurred within the next division over in the same jail should be as well." The *Ferree* court, however, was not persuaded by these facts in the manner defendant suggests. Instead, the *Ferree* court concluded that a note the defendant received, which threatened him bodily harm the next time the inmates were allowed out of their cells, constituted some evidence of a specific, immediate threat. *Ferree*, 221 Ill. App. 3d at 217.

According to the *Ferree* court:

> "The note posed a specific threat of death or great bodily harm to defendant in the
>
> immediate future.  He testified that once the cell doors were opened he would be subject
>
> to attack.  He explained that there was no time for a complaint to the authorities, because
>
> only one guard, who was unarmed, was visible and that guard could not be reached
>
> due to the 'security line' of inmates.  *** [T]here was no opportunity to resort to the
>
> courts  as the threat was made only an hour before defendant obtained the weapon." *Id.*

The evidence in *Ferree* established that an hour after the defendant received the note, the inmates

were allowed out of their cells.  *Id.* at 215.  Based on this evidence, the *Ferree* court concluded

the trial court erred in failing to instruct the jury on the necessity defense.  *Id.* at 218.

¶ 49     Defendant also relies on *Musgrove*, a prison escape case, to support his position that he

presented enough evidence to warrant a necessity instruction.  There, after the State's motion *in*

*limine* prohibiting the defendant from asserting the affirmative defense of necessity was granted,

the defendant went on to make an offer of proof in support of a necessity defense.  *Musgrove*,

313 Ill. App. 3d at 219.  In his offer of proof, the defendant indicated he would present evidence

that he began receiving death threats and threats of physical harm from other inmates after an

article appeared in the newspaper identifying him by name and describing his alleged scheme to

defraud fellow inmates.  *Id.*  The defendant further offered that he reported the threats to the

warden, the assistant Director of Corrections, filed a grievance that detailed his safety concerns,

and wrote numerous letters regarding his safety concerns with no response.  *Id.*  The defendant

stated he had no intention of getting away, but that the purpose behind his escape was to "get the

attention of the Department of Corrections officials."  *Id.* at 219-20.

¶ 50     The *Musgrove* court held the trial court abused its discretion when it granted the State's

motion *in limine* and thus denied the defendant an opportunity to present evidence on the defense of necessity. *Id.* at 222. According to the *Musgrove* court, the defendant testified he "feared for his life every waking minute and believed that an attack was imminent based upon the threats, gang activity, and level of hostility" in the prison. *Id.* at 221. The *Musgrove* court also noted the defendant "made numerous complaints to DOC officials about the threats and assaults, but no action was ever taken to ensure his safety." *Id.*

¶ 51 Conversely, in the matter before us, the trial court denied the State's motion *in limine* to prevent defendant from presenting a necessity defense. Consequently, we are not reviewing the trial court's decision on a motion *in limine*, but are instead considering whether the trial court erred in failing to provide the necessity instruction to the jury. In addition, *Musgrove* is an escape case, and although our supreme court has relied on such cases in matters where a detainee has been found with a weapon while incarcerated, this particular case does not address the inherent concerns of inmates possessing weapons in prison.[6] We further note that despite acknowledging that there was no evidence before it regarding whether the defendant was to blame in occasioning or developing the situation that led to his escape, the *Musgrove* court set aside that discrepancy to hold the defendant presented sufficient evidence to warrant a necessity instruction. *Id.* at 221-22. Importantly, the *Musgrove* court does not focus on the immediacy of the threats the defendant received, but instead focuses on the number of complaints he made to

---

[6] We observe that "in enacting section 31A-1.1(b), the General Assembly was concerned that the presence of the specified items of contraband, including, *inter alia*, weapons and drugs, among an inmate population would pose a threat to the safety of inmates and personnel alike and would impede the effective operation of penal institutions." *People v. Farmer*, 165 Ill. 2d 194, 208 (1995). This court has previously recognized that "[t]o allow [inmates] to possess weapons in any but the most desperate situations would defy common sense and exacerbate an already difficult and precarious security situation." *Govan*, 169 Ill. App. 3d at 338 (considering the applicability of a necessity defense to a charge of unlawful possession of a weapon by a felon in a Department of Corrections facility).

the pertinent authorities. Where, as here, a defendant is found in possession of a weapon while incarcerated, our supreme court has been explicit that a specific and immediate threat constitutes the very nature of a necessity defense and, thus, proof of that factor "is a threshold requirement for its establishment." *Kite*, 153 Ill. 2d at 45.

¶ 52   In sum, because defendant failed to provide even some evidence warranting the issuance of a necessity instruction, we conclude the trial court did not abuse its discretion when it did not instruct the jury on the affirmative defense of necessity.

¶ 53                              B.  Limiting of Evidence

¶ 54   Defendant next contends the trial court erred when it limited testimony regarding:  (1) the content of the threats he received from Munoz, Lawson, and Daniels; and (2) his need to protect himself.

¶ 55   The State contends defendant did not properly preserve these claims for appellate review. Defendant acknowledges he did not properly preserve his arguments regarding the threats from Daniels and Munoz because they were not raised in his posttrial motion.  Defendant further acknowledges that he did not properly preserve his claim regarding the evidence of his need to protect himself because he failed to raise this argument in his posttrial motion.  Defendant requests we review these contentions for plain error, as the evidence was so closely balanced that the error threatened to tip the scales of justice against him.

¶ 56   We agree with defendant that these contentions require plain-error review.  The plain-error doctrine allows us to consider a forfeited error when either (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear and obvious error occurs and that error is so serious that it affects the fairness of the defendant's trial and

challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Under both prongs of the plain-error analysis, the burden of persuasion remains with the defendant. *Id.* Before we undertake a plain-error analysis, however, we first determine whether an error occurred, for, absent error, there can be no plain error. *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010). While we acknowledge defendant has preserved his claim regarding the threats made by Lawson, under either a harmless-error analysis or a plain-error analysis the first step in our review is the same; to determine if any error occurred. See *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005) (harmless-error analysis and plain-error analysis are essentially the same; however, once error is found, a plain-error analysis places the burden on defendant to prove that the error was prejudicial).

¶ 57    In determining whether an evidentiary error occurred, we observe that "[a] defendant has the right to present a defense, present witnesses to establish a defense and to present his version of the facts to the trier of facts." *People v. Wright*, 218 Ill. App. 3d 764, 771 (1991). The admissibility of evidence at trial, however, is ultimately within the sound discretion of the trial court, and we will not overturn the court's decision absent a clear abuse of discretion, *i.e.*, where the court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). However, where the trial court has erred, such an error will not be prejudicial if it is harmless beyond a reasonable doubt. There are three approaches to determine whether an error is harmless: (1) whether the error contributed to the defendant's conviction; (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction; and (3) whether the excluded evidence would have been duplicative or cumulative. *People v. Lerma*, 2016 IL 118496, ¶ 33.

¶ 58                    1. Evidence of the Content of the Threats

¶ 59    Defendant argues the trial court impaired his ability to present a meaningful defense by preventing him from eliciting relevant evidence. Specifically, defendant argues the trial court should have allowed him to testify about the substance of the threats he received. According to defendant, the testimony regarding these threats was admissible under the state-of-mind exception to the hearsay rule. Defendant maintains the exclusion of this evidence was highly prejudicial because it prevented him from eliciting evidence to support his necessity defense.

¶ 60    The State contends defendant's argument that the trial court improperly excluded testimony regarding the threats he received was forfeited because he failed to make an offer of proof.

¶ 61    Here, we do not know the basis of the State's objection to the testimony about the threats or the trial court's rationale in sustaining the objection. When a party has stated no basis for an objection and the trial court has sustained the objection but provided no reason for its ruling, this court presumes that the trial court ruled on the grounds of relevancy. *People v. Upton*, 230 Ill. App. 3d 365, 372 (1992). If that was the State's objection, it would have been well taken, as explained above, the threats testified to were too remote in time to be relevant to a necessity defense. Moreover, we note that defense counsel made no request at any point during the proceedings to have the trial court clarify its rulings on these objections. See *People v. Landwer*, 166 Ill. 2d 475, 498 (1995) (holding that general objections are insufficient to preserve an error for review). Without knowing the specifics of the State's objection or the court's basis for sustaining the objection, we are left to speculate as to what occurred in the trial court and whether any error occurred.

¶ 62    "The responsibility of preserving a sufficiently complete record of proceedings before the trial court rests with the defendant, as the appellant." *People v. Banks*, 378 Ill. App. 3d 856, 861

(2007). "Where the record on appeal is incomplete, any doubts arising from that incompleteness will be construed against the defendant [citation] and every reasonable presumption will be taken in favor of the judgment below [citation]." *Id.* Given the state of the record, we must presume that the trial court's decision to sustain the objection to defendant's testimony was proper.

¶ 63    Moreover, despite defendant's claim he was not provided the opportunity to present his case because the trial court barred the evidence regarding the content of the threats, on appeal he " 'must provide [the] reviewing court with an adequate offer of proof as to what the excluded evidence would have been.' " *People v. Pelo*, 404 Ill. App. 3d 839, 875 (2010) (quoting *In re Estate of Romanowski*, 329 Ill. App. 3d 769, 773 (2002)). The purpose of an offer of proof is: (1) to disclose to the trial court and opposing counsel the nature of the proposed evidence so that the trial court may take appropriate action; and (2) to provide the reviewing court with an adequate record to determine whether the trial court's action was in error. *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998); *People v. Andrews*, 146 Ill. 2d 413, 421 (1992).

¶ 64    "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *Andrews*, 146 Ill. 2d at 420-21. In other words, when a trial court bars evidence, no appealable issue exists unless the denied party makes an offer of proof. *People v. Peeples*, 155 Ill. 2d 422, 457 (1993). If a criminal defendant claims on appeal that he was not able to prove his case because the trial court improperly barred him from presenting evidence but he failed to make an adequate offer of proof, he forfeits review of the issue on appeal. *Id.*; *Andrews*, 146 Ill. 2d at 421; see *Thompkins*, 181 Ill. 2d at 10.

¶ 65    Because defense counsel did not make an offer of proof regarding the content of the threats, we cannot determine whether exclusion of the evidence was proper. See *Andrews*, 146 Ill. 2d at 421. Thus, defendant has forfeited the issue on appeal. See *People v. Burgess*, 2015 IL

App (1st) 130657, ¶¶ 147-48.[7]

¶ 66                    2. Evidence of Defendant's Need to Protect Himself

¶ 67    Defendant further argues the trial court erred in excluding other relevant evidence of his need to protect himself.  Specifically, defendant points to the trial court limiting testimony regarding:  (1) multiple inmates being observed outside of their cells at the same time; and (2) the use of poppers.  Defendant contends that had the trial court allowed this testimony it would have directly challenged the State's theory that there was no risk of attack on tier 1E and supported providing the necessity defense instruction to the jury.

¶ 68    The State responds that this other evidence relating to defendant's need to protect himself is cumulative and irrelevant.  Despite the trial court sustaining the State's objections, defendant was able to elicit testimony that, at times, defendant interacted with other inmates when they were out of their cells and in the barber shop, dispensary, or during visitation and that inmates used poppers to get out of their cells.

¶ 69    Defendant first contends that the trial court improperly barred evidence of Anderson's observations of inmates on tier 1E outside of their cells simultaneously.  Specifically, defendant asserts the trial court erred in sustaining the State's objection to the following testimony:

        "Q.  Okay.  Are there times, in your experience, being on [tier 1E], when there was more than one inmate out at a time?

        A.  Yes.

        [THE STATE]:  Objection.

        THE COURT:  Sustained."

_____

[7] Defendant also asserts on appeal that the trial court improperly excluded Anderson's testimony regarding his observations of defendant being threatened in 2010.  We similarly conclude that defense counsel's failure to make an offer of proof regarding Anderson's potential testimony forfeits our review of this claim.

¶ 70     As previously discussed, where no basis for an objection has been stated and the trial court sustained the objection but provided no reason for its ruling, we presume that the trial court ruled on the grounds of relevancy. *Upton*, 230 Ill. App. 3d at 372. Although this testimony is relevant to illustrate the opportunity for other inmates to harm one another inside the CCDOC, our review of the record reveals that defendant elicited other testimony that inmates interacted with each other on tier 1E. Specifically, Officer Gosling testified that inmates are transported through the prison to be taken to court, for visitation, to consult with their attorney, or to obtain medical services. In these instances, it is possible that an inmate would encounter another inmate. Defendant testified that he interacted with other inmates at the barber shop, the dispensary, when being moved on the tier, and during visitation. Defendant further testified that he observed inmates on "numerous" occasions outside of their cells while he resided on tier 1E and that inmates could go anywhere on the tier, including up to another inmate's cell door. Based on the record, we find the exclusion of Anderson's testimony to be harmless as the witnesses testified to inmates encountering each other within the jail and, therefore, his testimony was merely cumulative. See *People v. Blue*, 205 Ill. 2d 1, 26 (2001) (an error is harmless beyond a reasonable doubt where the excluded evidence is duplicative or cumulative).

¶ 71     Defendant's second assertion, that the trial court improperly limited Anderson's testimony regarding inmates' use of poppers, is belied by the record. Contrary to defendant's assertions on appeal, over the State's objection, Anderson testified that a popper is "an object that detainees often place in their cell doors to defeat the lock mechanisms and get out of his cell to attack another individual." When asked if Anderson ever observed poppers being used in that manner on tier 1E, the State objected. The trial court sustained the objection without stating a basis for its ruling. Despite the court sustaining the objection, the jury was still able to consider

Anderson's testimony that a popper allows an inmate to "get out of his cell to attack another individual."

¶ 72    Moreover, four other witnesses testified regarding poppers or the use of poppers at CCDOC. Officer Gosling testified that, although he has never personally observed it, a detainee will utilize a popper to defeat the locking mechanism on the cell door. Sergeant Bialczak also testified that a popper allows an inmate to jam their cell door and prevent it from locking when it is closed. According to Mamon, a popper is "a little object that you could stick in the door to use to open your door" and that he observed inmates using poppers on tier 1E. Defendant also testified that inmates would use poppers on tier 1E and then interact with other inmates. Anderson's testimony, in conjunction with the testimony of four other witnesses, sufficiently demonstrated that poppers provided inmates with the opportunity to harm one another. Accordingly, the trial court did not abuse its discretion in limiting defendant's evidence regarding poppers, particularly where five witnesses testified about their use.

¶ 73                                    CONCLUSION

¶ 74    For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

¶ 75    Affirmed.