2025 IL App (1st) 240888-U

No. 1-24-0888

Order filed October 14, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 4482 |
| | ) | |
| ORLANDO BURNS, | ) | Honorable |
| | ) | Arthur Wesley Willis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's convictions for leaving the scene of a motor vehicle accident involving personal injuries are affirmed over his contention that the trial court erred by refusing jury instructions on the affirmative defense of necessity.

¶ 2   Following a jury trial, defendant Orlando Burns was convicted of two counts of leaving the scene of a motor vehicle accident involving personal injuries and sentenced to 30 months' probation with 250 hours' community service. Defendant appeals, contending that the trial court erred by not giving jury instructions on the defense of necessity. We affirm.

¶ 3    Defendant was charged with two counts of leaving the scene of a motor vehicle accident involving personal injuries to Gabrielle Bruce and Gabrielle Wynn on or about April 2, 2023 (625 ILCS 5/11-401(a) (West 2022)). The State alleged that defendant was the driver of a vehicle involved in a vehicular collision that resulted in personal injury to Bruce and Wynn and "knowingly failed to immediately stop [his] vehicle at the scene *** or as close thereto as possible," failed to remain at the scene until he had provided his name, address, and vehicle registration number, and failed to render reasonable assistance to anyone injured in the collision. Defendant was also issued citations on April 2, 2023, for failure to signal while turning left and failure to yield when turning left.

¶ 4    Defendant filed a discovery response on the day of trial, January 30, 2024, disclosing that he "will rely on the State's inability to prove their case beyond a reasonable doubt" and "may also rely on the affirmative defense of necessity."

¶ 5    At trial, the parties stipulated that the Chicago Police Department operated a video camera (the Pod) at the intersection of 67th Street and Cottage Grove Avenue in Chicago and that a certain video was an accurate copy of the April 2, 2023, video from the Pod. The video was entered into evidence for the State.

¶ 6    Bruce testified that, on the night of April 2, 2023, she was driving her red Jeep with Wynn as passenger in the front seat. She was driving east on 67th Street when she "was involved in a car accident" at the intersection with Cottage Grove Avenue. Bruce was about to proceed straight through the intersection when a black vehicle "coming straight" in the opposing direction made a left turn in front of her to go south on Cottage Grove. The front of her Jeep struck the side of the black vehicle, and the Jeep stopped while the black vehicle kept going on Cottage Grove. The Jeep's airbags deployed, and Bruce exited to check on Wynn, who was screaming. Bruce was in

- 2 -

pain, in shock, and scared. The police arrived, and an ambulance arrived later. Nobody approached Bruce at the scene to identify themselves as the driver of the black vehicle or to offer the black vehicle's insurance information.

¶ 7    Bruce viewed the Pod video and pointed out her red Jeep and the black vehicle, herself exiting the Jeep to check on Wynn, and herself falling to the ground after exiting. Bruce also pointed out when the police arrived on the scene and when she interacted with police officer "Rodriguez" (no first name provided). Bruce identified another video as an accurate depiction of the scene that night from Rodriguez's body-worn camera. That video was entered into evidence and shown at trial. Bruce pointed out herself and confirmed that crying sounds in the background were from Wynn.

¶ 8    Bruce and Wynn went to a hospital, where Bruce's right wrist pain was treated with a full arm cast. Bruce returned to the hospital about 10 days later for right wrist surgery, then engaged in physical therapy for about four months. As of trial, her wrist was still "not a hundred percent" as she lacked full mobility and had difficulty lifting heavy objects.

¶ 9    On cross-examination, Bruce testified that she and Wynn were going home from celebrating Bruce's birthday at a restaurant but denied having any alcoholic drinks. To drive through the intersection of 67th and Cottage Grove, Bruce first had to pass another vehicle waiting at the intersection. She saw the black vehicle approaching the intersection, and she slowed down but did not try to avoid the black vehicle as it "was too late."

¶ 10    Wynn testified consistently with Bruce, adding that 67th Street had the green traffic signal at the time of the collision, the black vehicle in the collision was a Dodge Durango, and Wynn saw it driving away southbound on Cottage Grove towards 71st Street. After the Jeep's airbags deployed, Wynn was in pain "[e]verywhere." Wynn was not approached at the scene by anyone

identifying themselves as being from the black vehicle. When she went to the hospital with Bruce, Wynn told the medical personnel that her neck, back, and left leg were painful. She underwent X-rays and left the hospital on crutches. As of trial, she still had "back problems" and a scar on her left leg.

¶ 11 The parties stipulated that two paramedics would testify that they went to 67th and Cottage Grove on April 2, 2023, where Wynn reported upper left leg pain, Bruce reported right wrist pain, and the paramedics transported them to a hospital. The parties also stipulated that an emergency room nurse would testify that Wynn reported upper left leg pain and was treated for abrasions to her left thigh and knee, while Bruce reported back and right wrist pain.

¶ 12 Chicago police officers Esteban Gonzalez and Carmella Abbott testified that, on the night of April 2, 2023, they responded to a report of a vehicular collision at 67th and Cottage Grove where a black Durango involved in the collision fled the scene. At 71st Street, they saw a black Durango with passenger-side damage going south on Cottage Grove, then turning to go southeast on South Chicago Avenue. In driving south on Cottage Grove, the Durango passed a police station on Cottage Grove at 71st. The officers curbed the Durango. The only occupant was the driver, whom they identified at trial as defendant.

¶ 13 Abbott observed defendant pull over to the right without incident when he stopped for police, despite the deployed airbags on the passenger side of the Durango. Gonzalez also observed the Durango's passenger-side airbags had deployed. Defendant told the officers "he didn't feel safe" stopping at the location of the crash and "it wouldn't be safe stopping in the street" or "it wasn't a safe place to pull over." Defendant did not tell officers he was afraid of being hit by another vehicle or being "carjacked." Abbott heard defendant claim to have stopped at the scene of the collision, though she did not see him stop before police signaled him to stop. Gonzalez

detained defendant because he was investigating a possible crash. When asked if there was any area available for defendant to pull over before the officers stopped him, Abbott replied "Yes."

¶ 14 Chicago police officer Ari Berk testified that he also responded on the night in question to the reported collision. When he arrived at 67th and Cottage Grove, he saw a red Jeep, an ambulance, and police vehicles. When Berk interviewed Bruce and Wynn in the ambulance before they left for a hospital, he did not smell any alcoholic beverages. Berk then went to the vicinity of 72nd and South Chicago, where he saw other officers had stopped a black Durango and detained defendant. Berk asked defendant why he did not remain at the scene at 67th and Cottage Grove, and defendant replied that "it wasn't a safe space." When asked if he had called 911, defendant admitted that he was on the telephone with a friend and had not called 911.

¶ 15 Gonzalez, Abbott, and Berk each identified a video as being from his or her body-worn camera on that night, recording when each spoke with defendant. All three videos were entered into evidence for the State and published at trial. Gonzalez noted the deployed airbags and defendant's remark that he was talking on the telephone at the time of the collision. Abbott noted defendant's remarks that he had stopped or pulled over, someone struck the side of his vehicle, and "it wasn't safe" to stop at the scene. Abbott also heard an officer tell defendant that he drove past a police station. Berk observed significant damage to defendant's vehicle, and he heard defendant's statements that he was on the telephone with a friend and did not call 911.

¶ 16 On cross-examination, Abbott testified that the police vehicle he and Gonzalez used that night had a dashboard camera, and identified a video recording from that night. The dashboard video was entered into evidence for the defense and shown at trial.

¶ 17 This court has viewed the videos entered into evidence that are in the record on appeal.

¶ 18 The Pod video shows a light-colored vehicle partially in the left turn lane on eastbound 67th waiting at a red light while traffic on Cottage Grove flows with a green light. After the signal light changes to stop Cottage Grove traffic and give 67th the green traffic light and walk signal, the light vehicle remains standing. A few seconds after the signal change, a black vehicle turns left from westbound 67th into southbound Cottage Grove as a red vehicle going east on 67th uses the right lane to pass the still-stationary light vehicle. The black vehicle cuts across the path of the red vehicle, which collides with the right or passenger side of the black vehicle. After the black vehicle passes out of view to the south, the red vehicle stops just south of the intersection and the driver falls out of the vehicle to the roadway, struggles to her feet, and goes to the front passenger door as a police vehicle arrives on the scene. The Pod video shows a gasoline station with a vast open area on the southwest corner of 67th and Cottage Grove, the entrance to which the black vehicle passes as it drives out of view.

¶ 19 The body-camera video shows that defendant stopped his Durango in a parking lane parallel to the through lanes of the street. The airbags on the right or passenger side of the Durango had deployed, so the right-side windows were mostly covered. The windshield was not obstructed. On the body-camera video, defendant is heard saying that he stopped twice before he was pulled over and could not have stopped in the middle of the street, He states "they hit the side of my car," and that he did not call the police, was on the telephone with a friend when the collision occurred, and did not stop at the scene because "the middle of the street" was not a safe place to stop because another car could have hit him and "there was no room to pull over."

¶ 20 Defendant testified that, on the night in question, as he approached the intersection of 67th and Cottage Grove in his Durango, there was a vehicle heading the opposite way about to turn north. "I thought I had clearance, so I turned left to go south on Cottage, and then all of a sudden

airbags deployed." He did not see the vehicle that struck his vehicle, and he kept going straight because he could see only forward. He "didn't stop in the intersection" because he was in an accident in 2019 where a vehicle in which he was a passenger was struck a second time after an initial collision, leaving him with "a broken neck." When asked what he was thinking as he continued south on Cottage Grove on the night in question, he replied that he was very nervous and afraid. "I didn't know what to do. I didn't know what had happened. I was just really confused. I just knew it wasn't safe to stay *** in that intersection right there." Defendant had just begun speaking with a friend on the telephone, using a hands-free device, when the collision occurred. Defendant pulled over when he saw police flashing lights behind him.

¶ 21 On cross-examination, defendant testified that he was "dizzy" after the collision and did not know what had happened beyond that his vehicle was in a collision sufficient to trigger its airbags. He did not know that another vehicle had struck his own. He did not pull over or call 911. Defendant did not see the police station he passed due to the deployed airbags on the right side of his vehicle. He would have stopped there had he seen it. Defendant attributed being able to pull to the right when he stopped for police to being on an "angled street." He acknowledged that he did not mention the 2019 incident to police on the night in question.

¶ 22 During the jury instruction conference, defendant sought instructions on the affirmative defense of necessity. The State argued that defendant had not admitted committing a crime against which he would present an affirmative defense. The court denied instructions on necessity because defendant had presented evidence of his subjective state of mind but no evidence that his reaction to not stop after the collision was objectively reasonable.

¶ 23 During deliberations, the jury sent the court a note: "Failed to stop close to the scene as possible. What does the law determine as close? Any range?" The court replied to the jury that it

heard the evidence, was instructed on the law, and should continue to deliberate. The jury resumed deliberations and found defendant guilty on both counts of leaving the scene of a motor vehicle accident involving personal injuries.

¶ 24    Defendant filed a posttrial motion claiming, in relevant part, that the trial court erred by not giving instructions on the necessity defense. The court denied the motion on March 14, 2024.

¶ 25    Following a sentencing hearing on April 8, 2024, the court sentenced defendant to 30 months' felony probation with 250 hours' community service, a victim impact panel, and a $5,000 fine.

¶ 26    On appeal, defendant contends that the trial court erred by not giving jury instructions on necessity.

¶ 27    To prove leaving the scene of a motor vehicle accident, in violation of section 11-401 of the Vehicle Code, the State has to prove that the defendant was the driver of a "vehicle involved in a motor vehicle accident resulting in personal injury to or death of any person" who did not "immediately stop such vehicle at the scene of such accident, or as close thereto as possible," or return to the scene, and remain at the scene until he or she had "give[n] the driver's name, address, registration number and owner of the vehicle the driver is operating, and *** render[ed] to any person injured in such accident reasonable assistance." 625 ILCS 5/11-401(a), -403 (West 2022). Defendant requested jury instructions on the affirmative defense of necessity.

¶ 28    Both the State and the defendant are entitled to appropriate instructions that present their theories of the case to the jury if and when the evidence supports such theories. *People v. Janik*, 127 Ill. 2d 390, 398 (1989). A defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which the defense is based are inconsistent with the defendant's own testimony. *Id*. A defendant is entitled to an instruction on his or her theory of the

case if there is some foundation in the evidence for the instruction; that is, " 'if there is some evidence, however slight, in the record to support that defense.' " *People v. Patterson*, 2024 IL App (1st) 221619, ¶ 15 (quoting *People v. Washington*, 2012 IL 110283, ¶ 43). A defendant is not required to provide this evidence, and evidence presented by the State may be sufficient. *Id*. When there is the slightest evidence for a defense but the trial court refuses to instruct the jury on the defense, the court abuses its discretion. *Id*.

¶ 29    Known as the necessity defense, section 7-13 of the Criminal Code provides that "[c]onduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2022). As an affirmative defense, "unless the State's evidence raises the issue involving [necessity], the defendant, to raise the issue, must present some evidence" of necessity, and then "the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to [necessity] together with all the other elements of the offense." 720 ILCS 5/3-2 (West 2022).

¶ 30    Necessity involves "the choice between two admitted evils where other optional courses of action are unavailable [citations omitted], and the conduct chosen must promote some higher value than the value of literal compliance with the law." *Janik*, 127 Ill. 2d at 399. The necessity defense has two elements: the defendant (1) was without blame in creating or developing the situation, and (2) reasonably believed that his or her conduct was necessary to avoid a greater public or private injury than that which reasonably might have resulted from that conduct. *People v. Brown*, 2023 IL App (4th) 220399, ¶ 22 (citing *Janik*, 127 Ill. 2d at 399). The second element requires that "the

threat of harm was immediate and defendant's conduct was the sole option to avoid injury." *Id.* ¶ 27 (quoting *People v. Boston*, 2016 IL App (1st) 133497, ¶ 39).

¶ 31 In *Janik*, our supreme court noted that "[n]ecessity requires that the conduct chosen be an offense, but it is justified if defendant reasonably believes it was necessary to avoid a greater harm than resulted from his illegal conduct." *Janik*, 127 Ill. 2d at 400. In *Janik*, the defendant convicted of leaving the scene of an accident involving death contended on appeal that the trial court erred in denying him jury instructions on necessity. *Id.* at 394-95. The *Janik* defendant had testified that he believed someone threw a mailbox at his vehicle, he was fearful for his safety, and it was best to drive four blocks home rather than stop. *Id.* at 400.

¶ 32 The supreme court found that, under these facts, the defendant's conduct did not constitute an offense because the evidence did not establish that there had been an accident or collision for which he had a duty to stop and render aid or provide information. *Id.* "[S]omeone, in an act of vandalism, had thrown something at his vehicle, in which case he had no duty to stop." *Id.* Our supreme court found that this "testimony, if believed by the jury, would not rise to a necessity defense. Instead, it would have refuted one of the elements of the crime of leaving the scene of an accident." *Id.* "Moreover, necessity requires a balancing of two evils. [Citation omitted.] According to defendant he was unaware of an accident and therefore could not have been balancing between the lesser of two evils and making a choice which promoted some higher value than literal compliance with the law." *Id.* Thus, the *Janik* court found the denial of necessity instructions was not erroneous. *Id.* at 399.

¶ 33 Here, defendant acknowledges that he knew at the time of the incident that his vehicle collided with another vehicle, and he knew he had to stop for the collision. Charged with breaching his duty to stop under section 11-401(a), he presented a defense of necessity, for which he required

jury instructions. In other words, defendant argues that his case is distinguishable from *Janik*, where the defendant did not know he struck another vehicle and was disputing whether he knew of his duty to stop so that the *Janik* defendant did not present an affirmative defense and did not need necessity instructions. *Janik*, 127 Ill. 2d at 400.

¶ 34 We agree defendant's case is distinguishable from *Janik* on that point. While defendant testified on cross-examination that he did not know at the time if another vehicle had collided with his, a defendant is entitled to the benefit of any defense shown by the entire evidence even if the facts on which the defense is based are inconsistent with defendant's own testimony. *Id.* at 398. The evidence as a whole was that defendant knew he struck another vehicle and therefore knew he had a duty to stop. He was recorded on the night in question remarking that "they hit the side of my car." Moreover, both on the night in question and in his trial testimony, he claimed it was unsafe to stop at the scene, not that he was not required to stop at all.

¶ 35 However, accepting that defendant's case is distinguishable from *Janik* is not decisive. Defendant presented evidence of his subjective belief that it was unsafe to stop at the scene of the collision because he had previously been in a collision that was followed by a secondary collision. He also told police on the night in question that he had stopped before they stopped him, which casts some doubt on whether he even subjectively believed it was unsafe to stop. Moreover, jury instructions on necessity are given when a defendant *reasonably* believed his conduct was necessary to avoid a greater injury, the threat of harm was immediate, and defendant's conduct was the sole option to avoid injury. *Brown*, 2023 IL App (4th) 220399, ¶¶ 22, 27.

¶ 36 We find that the trial court did not err in finding a lack of objective evidence for a necessity instruction. First, while defendant said "it wasn't safe to stay *** in that intersection right there," stopping at the scene would not have involved stopping in the intersection of 67th and Cottage

Grove, as he was through the intersection after striking the Jeep. Second, defendant's subjective fear of a secondary collision is not evidence that there was an immediate threat of harm from a secondary collision on the night in question. The Pod video does not show traffic so fast or careless that another vehicle would have collided with defendant's vehicle if he stopped near the scene. Instead, it shows two vehicles carefully passing the stopped Jeep in the moments between the collision and the arrival of police at the scene.

¶ 37    Last but not least, we cannot conclude that defendant's conduct, driving from a collision at 67th Street until he stopped for police near 72nd Street, was objectively the sole option to avoid injury. In those four blocks, he did not call 911 to report his willingness to stop or tell his friend on the telephone to do so. He passed a gasoline station on his right almost immediately after the collision, and he also passed a police station. Defendant puts great weight on the deployment of his passenger-side airbags as barring him from simply pulling to the right in those four blocks. However, there was no evidence that the airbags covering most of his passenger-side windows deprived him of vision to his right when looking through the unobstructed windshield. When signaled to stop by police, he pulled to the right without incident and parked parallel to traffic. Accordingly, defendant's belief that he should not stop at the scene of the accident or closely nearby and instead keep driving for over four blocks and not stop until pulled over by police was not reasonable.

¶ 38    For the reasons stated above, the judgment of the circuit court is affirmed.

¶ 39    Affirmed.