THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES C. FERREE, Defendant-Appellant.

Fifth District   No. 5—90—0128

Opinion filed October 9, 1991.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Darrell Williamson, State's Attorney, of Chester (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Charles C. Ferree, an inmate of the Menard Correctional Center in Randolph County, was convicted of unlawful possession of a weapon by a person in the custody of the Department of Corrections Facility (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1(b)). He was sentenced to seven years' imprisonment to be served consecutively to his sentence from Cook County which he was serving at the time of the current offense. The defendant raises only one issue for our consideration: whether the court erred in refusing to instruct the jury on the affirmative defense of necessity.

At trial, the State presented the testimony of three correctional officers who were directly involved in the incident. Pinkie Vernon Dotson testified that on July 9, 1989, at approximately 4:45 p.m., 10 correctional officers were conducting a pat search of the inmates, who were moving from one cellhouse to the dining hall, to determine if they had contraband or anything they were not supposed to have. Dotson searched defendant and found a solid object in his pants. When he tried to retrieve the object, defendant brushed his hand away. After two other correctional officers came to his assistance, Dotson reached down inside defendant's belt line and pulled out a homemade knife, which was made out of a flat piece of steel. The knife was about one-half inch wide and 6½ inches long. One end of the knife had been taped to make a handle, and the other end was inside a sheath made out of tape. Prior to July 9, 1989, Dotson had been involved in other searches during which other correctional officers have found knives and other contraband.

Menard Correctional Center Lieutenant Scott McKee testified that on July 9, 1989, at approximately 4:45 p.m., he was supervising the shakedown of inmates when Dotson advised him that defendant had a knife or similar object in his pants and would not let Dotson remove it. At McKee's instruction, defendant raised his hands, and Dotson removed a homemade weapon from inside defendant's pants. McKee handcuffed defendant and returned him to his cell. McKee also testified that during a year's time hundreds of weapons are confiscated from inmates and that correctional officers do not possess weapons while working on the ground.

Menard Correctional Center Captain Danny Jaimet testified that on July 9, 1989, at approximately 4:45 p.m., he observed Dotson remove the weapon from defendant's pants. While working at Menard, Jaimet had personally found numerous weapons and testified that, in some cases, weapons are closely associated with gang activity. He also stated that the Latin Kings are one of the well-organized gangs and that a person, especially a young white man, leaving a gang without its permission could be in serious trouble.

Defendant, who had been sentenced for burglary and theft of an automobile, testified that while he has been in the Department of Corrections he had been a member of the Latin Kings. He joined during the fall of 1985; however, at the time of the offense he was no longer a member of that gang. He had joined the gang because he had been threatened by "a lot of people" who were trying to take his possessions such as cigarettes or groceries. If one did not allow them to take the possession, the other inmates would beat or sexually molest that person. After one such attack at Statesville prison the defendant went into protective custody. Other inmates usually did not bother Latin Kings' members. He first tried to resign from the Latin Kings during the summer of 1986, but they forced him back into the gang. On this occasion he did not ask for the gang's permission to quit. He was scheduled to be released from prison on January 5, 1990, and believed that if he stayed in the gang, it would require him to perform a task that would result in not being released. While at Menard, he has completed his high school education and has worked on tables in the kitchen, as a teacher's aide, and as a night porter.

Defendant identified a note that he received at approximately 3:30 p.m. on July 9, 1989. The note was folded and thrown into his cell while he was watching television; therefore, he did not see the person who threw the note. The note stated: "I know your pretty ass no longer belongs to the kings, so when the doors roll, your ass is mine, Punk." He explained that the phrase "when the doors roll" refers to

the time when the inmates are allowed out of their cells to be taken to eat. Shortly after receiving the note, the doors were rolled open. He walked across to one of the air vents where he knew a knife was kept and took the knife which Dotson subsequently found in his possession. He took the note seriously because he had observed one inmate killed, supposedly by the Latin Kings. Until receiving the note, he did not fear for his life. After resigning from the gang, he possessed no weapon other than the one found by Dotson.

Defendant explained that the reason he did not notify a guard of the threatening note was because there was only one guard in the sergeant's office. The gangs have a security line, and if a nongang member tried to get inside the security line that person would be jumped. He did not see the 10 correctional officers, who were conducting the search, until after he rounded a corner. He admitted that he did not tell the correctional officials of the note and did not tell those conducting the search that he had been threatened. Although he had been in protective custody while in the Statesville prison, he did not request to be placed in protective custody while at Menard. He had been cut but not stabbed in Statesville. He spent two days in Menard prison hospital due to a beating. After the weapon was discovered on him, he did not request to be placed in protective custody, because he had not felt safe previously while in protective custody. The gang had threatened to follow him there and to kill him there. He admitted that he had been in other-than-maximum security prisons but had been returned to maximum security for fighting.

Defendant objected to the State's instruction which did not contain references to the necessity defense. He tendered the following instructions which were denied by the court:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the defendant was without blame in occasioning or developing the situation and reasonably believed that such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." Illinois Pattern Jury Instructions, Criminal, No. 24—25.22 (2d ed. 1981).

"To sustain the charge of Unlawful Possession of Weapon by Person in Custody of a Department of Corrections Facility, the State must prove the following propositions:

First: That the defendant knowingly possessed a daggerlike weapon; and

Second: That said defendant was confined in a penal institution which is a facility of the Illinois Department of Corrections at the time of the offense.

Third: That the defendant did not act out of necessity.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." Non-IPI, see Ill. Rev. Stat. 1989, ch. 38, pars. 24—1.1(a), (b).

In denying defendant's tendered instructions, the trial court relied on *People v. Govan* (1988), 169 Ill. App. 3d 329, 523 N.E.2d 581, and held that defendant was not faced with an emergency situation because he had an opportunity to report the threatening note and did not do so. Further, defendant had not asked to be placed in protective custody.

During jury deliberations, the jury sent three notes to the trial judge. The first read:

"Are we, the jury, allowed to make any recommendation with regard to the defendant's further sentence or future placement?"

The court responded, "Sentencing of any defendant is sole discretion and duty of the trial judge." The second note asked, "What is the maximum and minimum sentence for this charge?" The court responded, "It is not the jury's duty to concern themselves with possible sentences. It is the duty of the jury to determine guilt or innocence." The last note stated: "We are signing the guilty verdict in spite of our personal evaluations regarding the defendant's circumstances. However, we are obliged and sworn to so find under the law." The docket minutes indicate the jury spent 3 hours and 15 minutes deliberating.

■■ ■ Necessity is an affirmative defense with statutory requirements: (1) that the person claiming the defense was without blame in occasioning or developing the situation; and (2) that the person reasonably believed that his conduct was necessary to avoid a greater public or private injury than which might reasonably have resulted from his conduct. (Ill. Rev. Stat. 1989, ch. 38, par. 7—13.) In order to properly raise the affirmative defense of necessity, the defendant must present "some evidence" in support of the claim. (*People v. Unger* (1977), 66 Ill. 2d 333, 338, 362 N.E.2d 319, 321.) In general, a defendant is entitled to have the jury instructed on the defense of ne-

cessity when evidence, sufficient to raise a reasonable doubt as to guilt, has been introduced that the accused, without blame in occasioning or developing the situation, reasonably believed his conduct, which would otherwise be an offense, was necessary to avoid a public or private injury greater than the injury which might have resulted from his own conduct. (*People v. Newbolds* (1990), 204 Ill. App. 3d 952, 954, 562 N.E.2d 1050, 1052.) Once some evidence in support of the defense has been presented, the State has the burden to disprove the defense beyond a reasonable doubt. *People v. Tackett* (1988), 169 Ill. App. 3d 397, 402, 523 N.E.2d 647, 650.

■ In *People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319, the Illinois Supreme Court discussed factors which are relevant in assessing a claim of necessity to charges of escape from prison. Although an escape charge necessarily involves different considerations from charges of unlawful possession, three of the factors discussed in *Unger* are especially pertinent here. Those factors include: (1) the prisoner is faced with a specific threat of death, forcible sexual attack, or substantial bodily injury in the immediate future; (2) there is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaint illusory; and (3) there is no time or opportunity to resort to the courts. (*Unger*, 66 Ill. 2d at 344, 362 N.E.2d at 323, citing *People v. Lovercamp* (1974), 43 Cal. App. 3d 823, 831-32, 118 Cal. Rptr. 110, 115.) These factors are not to act as an exclusive determination, but rather go to the weight and credibility of the evidence presented in support of an affirmative defense of necessity. *Unger*, 66 Ill. 2d at 342, 362 N.E.2d at 323.

■ The record before us presents "some evidence" in support of the necessity defense. The note posed a specific threat of death or great bodily harm to defendant in the immediate future. He testified that once the cell doors were opened he would be subject to attack. He explained that there was no time for a complaint to the authorities, because only one guard, who was unarmed, was visible and that guard could not be reached due to the "security line" of inmates. It was not until after he possessed the shank and rounded the corner that he saw more correctional officers. Lastly, there was no opportunity to resort to the courts as the threat was made only an hour before defendant obtained the weapon. Although the State's cross-examination of defendant created doubt about the defense of necessity, he was entitled to have the jury consider the defense on the basis of his testimony. It is clear that he introduced some evidence to support the defense of necessity. As previously mentioned, "some evidence" is

sufficient to justify the giving of an appropriate instruction. (See *Unger*, 66 Ill. 2d at 341, 362 N.E.2d at 323.) Further, the jury's notes suggest that they may have given some credence to defendant's testimony. We conclude that the trial court erred in failing to instruct the jury on the necessity defense.

■■ The State also argues that the affirmative defense of necessity cannot be used to negate the intent requirement of the crime because section 24—1.1(b) provides, in part, that a person who possesses a weapon while incarcerated in a Department of Corrections facility is guilty of a crime, "regardless of the intent with which he possesses it." A similar argument was rejected in *People v. Govan* (1988), 169 Ill. App. 3d 329, 523 N.E.2d 581; therefore, we need not further discuss this contention by the State.

The State relies on *People v. Govan* (1988), 169 Ill. App. 3d 329, 523 N.E.2d 581, and *People v. Tackett* (1988), 169 Ill. App. 3d 397, 523 N.E.2d 647. Both Tackett and Govan were inmates of the Pontiac Correctional Center, and both raised the necessity defense to charges of unlawful possession of weapons by a felon. They tendered instructions on the necessity defense which were rejected by the court, but the facts of those cases are clearly distinguishable. Tackett possessed his weapon for over a year and carried it whenever he thought necessary, while Ferree testified that he only possessed the weapon after receiving the threatening note. Tackett had never been seriously injured while Ferree had been cut and was hospitalized for two days as the result of a beating. (See *Tackett*, 169 Ill. App. 3d at 402-03, 523 N.E.2d at 650.) In *Govan*, the inmate received the threatening note three or four weeks prior to being found in possession of his weapon, while Ferree testified he obtained the weapon, which had been in a "public place," almost immediately prior to being found with it.

For the foregoing reasons, this court concludes that defendant produced sufficient evidence to require that the jury be instructed on the necessity defense. The trial court erred in refusing those instructions; therefore, the judgment of the circuit court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

GOLDENHERSH and HOWERTON, JJ., concur.