NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240828-U

NO. 4-24-0828

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 27, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| TERRANCE NELSON, | ) | No. 23CF650 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Harris and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held:* The appellate court affirmed defendant's conviction and sentence.

¶ 2     In July 2023, the State charged defendant, Terrance Nelson, by indictment with two counts of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2022)), alleging that on June 30, 2023, defendant possessed a firearm and had been previously convicted of (1) aggravated battery in 2013, a Class 2 felony (count I), and (2) unlawful delivery of a controlled substance within 1,000 feet of a church in 2015, a Class 1 felony (count II). In December 2023, a jury found defendant guilty of one count of UPWF. Later, the trial court sentenced defendant to nine years in prison.

¶ 3     Defendant appeals, arguing the trial court abused its discretion by (1) refusing to instruct the jury on the necessity defense and (2) imposing an excessive prison sentence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Charges

¶ 6            In July 2023, the State charged defendant by indictment with two counts of

UPWF (*id.*), alleging that, on June 30, 2023, defendant possessed a firearm and had been

previously convicted of (1) aggravated battery in 2013, a Class 2 felony (count I), and

(2) unlawful delivery of a controlled substance within 1,000 feet of a church in 2015, a Class 1

felony (count II).

¶ 7                                    B. The Jury Trial

¶ 8            In December 2023, the trial court conducted defendant's jury trial.

¶ 9                            1. *Summary of the Evening of the Offense*

¶ 10           On June 30, 2023, around 8 p.m., defendant's former partner, Tanisha Moon,

arrived at defendant's apartment at 1917 Tracy Drive in Bloomington, Illinois, to drop off their

three children for a visit. Defendant lived with his brother, Michael Frazier, who was not present

at the time. After Moon arrived and the children entered the apartment, she and defendant

engaged in a physical altercation that resulted in minor injuries to both parties. Once Moon left,

defendant immediately called the police to report the altercation.

¶ 11           Bloomington police officers Bryan McCall and Jaime Tabeling arrived at the

apartment shortly thereafter. They interviewed defendant and photographed his injuries, which

included a bleeding scalp where hair had been pulled out. The officers recorded this interaction

on their body cameras. Afterward, they attempted to contact Moon but could not reach her. After

speaking with the police, defendant left the apartment with his children to stay at his cousin's

house because he feared for his safety.

¶ 12           Later that evening, around 11 p.m., Moon returned to the apartment. Frazier had

returned and was present with his girlfriend, Paige Brown. Frazier contacted defendant and told him that Moon was outside the apartment, causing a disturbance. Defendant returned to the apartment, leaving his children in a neighbor's care. To avoid confronting Moon in the hallway outside the apartment door, defendant climbed through one of the apartment windows from the second-floor deck. According to defendant, Frazier and Brown urged him to handle the situation with Moon. Defendant then borrowed Brown's loaded handgun and opened the apartment door. Standing in the doorway, he announced to Moon, "No, I'm right here. I'm right here. Y'all know," while holding the handgun with the barrel pointed downward. Moon filmed the brief interaction using her cell phone. Defendant then placed the gun behind his back and returned inside the apartment, closing the door.

¶ 13        Defendant returned the handgun to Brown, and Frazier called police. Four Bloomington police officers responded to the call: Officers (1) McCall, (2) Tabeling, (3) Brennan Burns, and (4) Logan Fosdick. The officers spoke with Frazier, Brown, Moon, and defendant and then arrested defendant after viewing the video Moon had taken that showed defendant holding a handgun. The officers also secured Brown's handgun. The officers recorded these interactions on their body cameras.

¶ 14                            2. *Tanisha Moon*

¶ 15        Moon testified that she had known defendant for over a decade and had three children with him, ages 10, 8, and 4. Their relationship ended approximately two years before the events at issue.

¶ 16        On the evening of June 30, 2023, Moon dropped the children off at Frazier's apartment. Moon testified that although this was not a scheduled visit, she had communicated her intention to bring the children over. She acknowledged that they had not agreed on a particular

length of visit and that she and defendant had an altercation when she dropped the children off. Later that evening, defendant contacted Moon and told her that if she did not return to pick up the children, he would drop them off elsewhere.

¶ 17        Around 11 p.m., Moon returned to the apartment to pick up the children. She encountered defendant while standing in the upstairs hallway outside Frazier's apartment. Defendant held a black handgun with either a pink or "rose gold" color on the side. Moon recorded the incident using her cell phone and showed the video to responding Bloomington police officers that night.

¶ 18        The trial court admitted the three-second video into evidence and published it to the jury. In the video, defendant can be seen standing in the vestibule of the apartment, shouting, "No, I'm right here. I'm right here. Y'all know," while holding a firearm in his right hand with the barrel pointed downward. He then moved his right hand behind his back, transferred the firearm to his left hand, and walked back inside the apartment.

¶ 19        On cross-examination, defense counsel asked Moon about an incident on November 15, 2022, involving Frazier calling the police to his apartment because Moon attacked him. She testified, "I'm not sure about that. All I know is I was told he had smacked my son in the face because he thought he broke something of his. I wasn't there, and so he smacked my son." Moon stated that when she contacted defendant about Frazier's conduct, he told her he had "handled it," which she understood to mean that defendant had physically confronted Frazier.

¶ 20        Defense counsel also asked Moon about a prior incident involving defendant that occurred on May 5, 2023, outside a convenience store. Moon acknowledged the incident and testified that defendant sustained a cut when he grabbed a razor blade from her hand. She explained that she carried the razor blade for personal protection, particularly because she was

often alone with her children. Moon denied cutting defendant intentionally and testified that defendant had struck her during the incident, prompting her to retrieve the blade. Moon testified that she and defendant spoke with police officers following the incident but that no one was arrested.

¶ 21　　　　　　　　　　　　　　3. *Police Officers' Testimony*

¶ 22　　　　　　Four Bloomington Police Department officers testified about the events of June 30, 2023—namely, Officers (1) McCall, (2) Tabeling, (3) Burns, and (4) Fosdick.

¶ 23　　　　　　Officer McCall testified that at around 10 p.m., he responded to a call from 1917 Tracy Drive after receiving "multiple calls suggesting that there was an argument, or some kind of altercation, a fight. And then one caller stated there was a gun involved." When he arrived, he spoke with Moon, who was one of the callers. He described her as "emotional and frantic" and said he had difficulty understanding her. He also spoke with defendant, noting that defendant and Moon had been in a dating relationship for about 9 to 10 years.

¶ 24　　　　　　Moon showed McCall the video she had recorded on her cell phone of defendant standing outside the apartment door holding a handgun and then returning inside. McCall identified the weapon he observed in the video as "a black GLOCK 43, 9mm compact handgun. It had a rose gold slide on the top of it," and there was "a round in the chamber, and there was, [he believed], four rounds in the magazine."

¶ 25　　　　　　Officer Tabeling testified that at around 11 p.m., she responded to the report of an armed individual at the same address. When she arrived, McCall was already on the scene. She spoke with defendant and Brown. Brown gave Tabeling her handgun, and Officer Burns then secured the weapon. Tabeling's body camera recorded her conversations with both Brown and defendant; the trial court admitted these videos into evidence, and they were played for the jury.

¶ 26 Officer Burns testified that when he arrived at the apartment, Tabeling had already recovered a handgun from Brown. She handed the gun to him, and he secured it in McCall's squad car. Burns identified the weapon as a 9-millimeter Glock 43.

¶ 27 Officer Fosdick testified that he also responded to the apartment. When he arrived, he spoke with Brown, who told him that she was inside the apartment when defendant called the police. Fosdick explained as follows: "We had received a call from [defendant] saying that there was a female in his—ex who was back on scene from a previous issue that they had had." Brown told Fosdick that she had a handgun, and their conversation was recorded on his body camera. The trial court admitted that video into evidence and played it for the jury. Fosdick was the last officer to speak with Brown and remained on the scene with Moon because they were trying to locate her children, which took several hours.

¶ 28 Based on his investigation, McCall arrested defendant after viewing Moon's video.

¶ 29 On cross-examination, Tabeling and McCall testified about their earlier visit to the apartment that evening. McCall explained that he had responded at around 8 p.m. because defendant called 911 stating that Moon had attacked him. He photographed defendant and the injuries he sustained, which the trial court admitted into evidence. One photo showed "[s]ome sort of cut" on the top of defendant's head. Tabeling confirmed that she accompanied McCall on this earlier call and that the police arrested no one in connection with the injuries defendant received.

¶ 30 McCall testified that he had made several attempts to contact Moon before the second incident, stating as follows:

"I had made several attempts to talk to her before this second incident took

place. I had gone to her residence to try to speak to her. I called her multiple times on her phone and was unable to make contact with her until she called us for this incident. At that point I was able to speak to her about this incident she called about, and the previous incident [defendant] called about."

¶ 31 When Moon spoke with McCall, she admitted to McCall that she hit defendant in self-defense earlier that night and had a cut on the inside of her lip, which McCall photographed. He described the injury as "a small, like, scratch you can see here, a specific area of redness on her lips—I'm sorry, on her lower lip." The trial court admitted these photographs into evidence.

¶ 32 The State called Officer Fosdick as a rebuttal witness regarding his response to the later incident at 1917 Tracy Drive on June 30, 2023. He testified that while on the scene, he spoke with defendant, who told him that Moon came back to Frazier's apartment while he was away and that Frazier had texted defendant that Moon had returned with "a couple dudes." So, defendant returned to the apartment. Fosdick asked defendant if there had been any physical altercation when he went out the front door of the apartment. Defendant said nothing physical occurred. He said that he saw Moon, walked back inside the apartment, and locked the door.

¶ 33 Fosdick's body camera recorded his conversation with defendant, and the trial court admitted the recording into evidence and played it for the jury. During this conversation, Fosdick learned over the radio that other officers had viewed a video of defendant possessing a gun. After learning this, Fosdick arrested defendant.

¶ 34                                    4. *Stipulation*

¶ 35 The trial court read the following stipulation regarding defendant's previous felony convictions:

"The People of the State of Illinois by Assistant State's Attorney Emily Young,

and the defendant, \*\*\*, by and through his counsel Matthew Koetters stipulate to the following facts and evidence. That prior to the offenses of [UPWF] alleged in this case, the defendant, \*\*\*, was convicted of the qualifying felony offenses alleged regarding those offenses. That's signed by each of the parties."

¶ 36                                    5. *Frazier*

¶ 37        Frazier testified that he was defendant's brother and had lived at 1917 Tracy Drive for almost a year. Frazier testified as follows regarding the events on the evening of June 30, 2023:

> "Early I was sitting with my girlfriend. I got a call from my brother. I'm not sure what time it was. He was telling me about how him and [Moon] were getting into it again or whatever happened. She must have—he was at the store. He something, like, that he got into it earlier. I'm, like, okay. Cool. I hadn't talked to him none that day after that. So, I'm on my way. I go home. I go to my apartment, which is on Tracy. I come in the door, I see [Moon] on the stairway. I don't know why she there. You know what I'm saying. She not 'pose to be around me. That's what I thought after this situation. So I don't know. At this point I'm nervous. I don't know what she's gonna do. I call him, she in my hallway. I don't know what is going on. At this point I'm, like, she outside the hallway making noise, banging on the wall, banging on my door, acting belligerent, 'cause she looking for him, waiting for him to come back. He not coming back. He not coming nowhere around. So I was, like, man. I called the police."

¶ 38        Moon never entered the apartment while Frazier was present. Brown was in the apartment with him, and he called 911, stating, "They in my hallway. I'm scared. I know she

damaged. They need to come get her. That's why I called. Come get the lady from my hallway."

¶ 39        Regarding the events of November 15, 2022, Frazier testified that at around 3 p.m., Moon came to his "baby momma's apartment," and the following occurred:

> "She came to my—knocked on the door, I answered—I guess she was looking for him. I opened the door, I get a punch to the face. They came in the house. It was two of them. She brought somebody with her. Beat me in front of my kids. I don't know what for, but she put her hands on me. And then she—they jumped me for no reason."

¶ 40        After Moon and her companion left, he called the police. When they arrived they questioned Frazier and took photographs of his injuries. The trial court admitted these photos into evidence. One photo showed Frazier's busted lip. Another showed hair ripped out on top of his head. He had a big bruise on his arm, which he claimed was from "getting stomped on the floor." Frazier told officers that Moon and an unknown man came over because of an accusation that he had slapped her son. He had no idea who the man was and did not know if he told officers at the time that he knew who the man was. After officers left, no one contacted him again or told him of any arrest.

¶ 41        On cross-examination, Frazier acknowledged that he had several felony convictions: (1) a 2011 Class 4 felony for unlawful use of a weapon in McLean County, (2) a 2014 Class 1 felony for unlawful delivery of a controlled substance on park property, (3) a 2014 Class X felony for possession of a controlled substance with intent to deliver, and (4) a 2023 Class 4 felony for aggravated driving under the influence in McLean County.

¶ 42        He also acknowledged that he made no statement to officers on June 30, 2023, when they arrived and never attempted to contact police officers after that night. His testimony at

trial was the first time he provided information about that date.

¶ 43          Frazier testified that he never saw Moon in the hallway or having contact with defendant on June 30, 2023. Moon never touched Frazier that night.

¶ 44          Frazier admitted that while the video of Brown's statements was being played in court, he was standing in the courthouse hallway near the door to the courtroom. However, Frazier stated that nothing he heard from the courtroom affected his own testimony.

¶ 45                              6. *McCall (Recalled)*

¶ 46          McCall testified that while waiting to testify outside the courtroom in the hallway, he observed Frazier standing at the door to the courtroom while officers played body camera footage of Fosdick speaking with Brown. Someone then came out and told Frazier he was not allowed to stand there and could not listen to testimony. Frazier then sat in the chair closest to the door.

¶ 47                              7. *Defendant*

¶ 48          Defendant testified that he was 33 years old and lived with his brother, Frazier. He had been together with Moon for nearly 10 years.

¶ 49          Regarding the evening of June 30, 2023, defendant testified that Moon texted him that she needed money for rent, so he electronically sent her $360 at around 5 or 6 p.m. They texted back and forth, and eventually, he heard a knock on the apartment door. He opened the door to see his children, whom Moon had dropped off without any forewarning. Defendant texted Moon to tell her that he had a new girlfriend who was pregnant and Moon responded that he was "going to get it." He went out into the hallway of the apartment building, leaving the door unlocked.

¶ 50          When defendant returned, Moon was standing inside the apartment. She

confronted him about having a new child on the way and then attacked him by pulling his hair out, hitting him, and biting him. He forced her out of the apartment, closed the door, and then called the police. Two police officers arrived between 20 and 30 minutes later. He showed the officers the text messages and told them about what had happened. Defendant recounted the following exchange:

> "[The police officer] said I'm going to ask you five questions. And I said okay. Do you fear for your life? Yes. Do you think [Moon's] going to come back? Yes, she's going to come back. She's definitely going to come back. Do you feel she's going to bring harm to you? Yes, I do. Do you think she's going to bring other people? Yes. And the last one was: Do you think she's capable of killing you? I told them, yes. I said, yes. It's ongoing. I kept getting away from her. Even when I try to get away she still follows me."

¶ 51 Defendant mentioned getting an order of protection. One of the officers told him that he would have to wait for Monday "to do a report." The officer mentioned ways for defendant to go about getting an order of protection. The officers took photos of defendant's head injury, which were admitted into evidence and shown to the jury.

¶ 52 After the officers left the apartment, defendant took his children to his cousin's house, which was 10 to 15 minutes away, so they could all be somewhere safe. He was there for about 30 to 45 minutes when Moon texted him, asking where he went. Frazier then called defendant and told him that Moon was outside the apartment, kicking the door; Frazier told defendant that if he did not handle the situation, he would no longer be able to stay with him.

¶ 53 Defendant asked his cousin to watch the children and returned to Frazier's apartment. When he arrived, he climbed into the second-floor apartment through a window.

Defendant explained that he wanted to avoid getting "killed" by entering through the stairwell where Moon was.

¶ 54    Once he was inside, Frazier and Brown told defendant that he had to deal with Moon because they were afraid to confront her. Brown gave defendant her gun. He opened the door, walked out, and announced to Moon that he was "right here." He did not point the gun at her or threaten her with it. He was aware that Moon filmed him with her cell phone.

¶ 55    Once he saw that Moon had no one with her, he went back inside and shut the door. He then told his brother to call the police, which Frazier did. Moon continued to bang on the door of the apartment while defendant waited for police officers to arrive. He was not thinking beyond ensuring that he was safe and there were no men outside the apartment. He then gave Brown her gun back.

¶ 56    Defendant testified that he came back to the apartment when Frazier called because it was not his brother's situation to take care of; it was his "as a man." He went back to make sure that his brother and a family member were safe. Defendant explained that he snuck into the apartment through the window because he did not want to have any type of conflict with Moon. Officers Tabeling and McCall arrived thereafter in response to the call. Defendant testified that he first told them that he did not possess a firearm because he did not want to go to jail since he was a felon.

¶ 57    Regarding the May 5, 2023, incident at the convenience store, defendant testified that Moon had called and asked him to meet her at a convenience store because she wanted to talk. So, he walked to the store to meet her and his children in the store parking lot. He told her that they were "done," and she began to cry. She asked defendant if she could get his Link card, which he gave her by tossing it onto the seat of her car, causing her to become upset. Moon then

attacked him, stating, "You think you're bigger than me." He could tell she had been drinking, and he pushed her away without hitting her. She then threw multiple glass bottles at defendant and grabbed a knife from her car. He attempted to take the knife from her, and she cut his hand. During this time, the store owner called the police. Moon drove away, and defendant waited for police officers to arrive. The officers spoke with defendant and took photos of his injuries. These photos were admitted into evidence and shown to the jury. No arrests were made in connection with this incident.

¶ 58                             8. *Defendant's Prior Convictions*

¶ 59          At the State's request, the trial court recited to the jury defendant's prior convictions for the purpose of impeachment. The court stated as follows:

> "Thank you. Ladies and gentlemen, the defendant in this case, on August 21st—strike that—on July 30th of 2013, was previously convicted in McLean County case 13-CF-665, of the Class 3 felony offense of aggravated battery. In addition, on July 30th of 2013, the defendant was convicted in McLean County case 13-CF-768 for the Class 4 felony offense of unlawful delivery of cannabis. In addition, ladies and gentlemen, on December 11th of 2013, the defendant was convicted in McLean County case 13-CF-1174 for the Class 4 felony offense of possession of a controlled substance. And on August 21st of 2015, the defendant was convicted in McLean County case 14-CF-1205 for the Class 1 felony offense of unlawful delivery of a controlled substance.
>
> Ordinarily, evidence of a defendant's prior conviction of an offense may be considered by you only as it may affect his believability as a witness, and must not be considered by you as evidence of his guilt of the offense of which he was

charged. However, in this case, because the State must prove beyond a reasonable doubt the proposition that the defendant has previously been convicted of a qualifying offense—a qualifying felony offense, you may also consider the defendant's prior conviction of the qualifying felony offense for the purpose of determining whether the State has proved that proposition."

¶ 60                           9. *Jury Instruction Conference*

¶ 61        Defense counsel asked the trial court to give the jury instruction for necessity, arguing that (1) Moon "had already used a weapon against" defendant in May 2023 and (2) on June 30, 2023, defendant "didn't have any understanding of what was on the other side of that door and felt that this was the only way to resolve that situation." Counsel explained that defendant did not instigate the incident and returned only at his brother's urging. Given the past history of violence between defendant and Moon, he reasonably believed that arming himself with a gun was necessary to protect himself and his brother.

¶ 62        The State argued that defendant failed to show any evidence in support of the necessity defense—namely, that he (1) was without blame in occasioning or developing the situation and (2) reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might reasonably have resulted from his conduct. See *People v. Janik*, 127 Ill. 2d 390, 399 (1989). The State noted that defendant chose to return to Frazier's apartment with the intent to confront Moon with no indication that she was armed.

¶ 63        The trial court denied defendant's request to instruct the jury on necessity and explained why the evidence did not support a necessity instruction. The court first recounted the following facts, which it noted were not in dispute:

        "Moon had apparently shown up at the defendant's brother's residence and

- 14 -

dropped off three children. There was an incident, an alleged incident, police were called, police responded, and then several hours later she showed back up at the apartment. The second time that she showed up the defendant was not there. He had taken the kids and gone to a residence *** which [was] nowhere near Tracy Drive, so quite a ways away from his brother's residence."

¶ 64    The trial court then described the situation that defendant was in after he left Frazier's apartment as follows:

"He's there with the children having no intention to return to the apartment that evening, and he gets a phone call from his brother *** saying *** Moon is here and she's throwing a fit in the hallway, banging on walls, whatever. At that point that's the situation. Defendant's nowhere near there, the children are nowhere near there, *** Moon is there, *** Frazier is there and maybe one or two other people in the apartment. At that point the logical course of action would be to contact the police and have the police return and deal with the situation. That's not what the defendant did. The defendant decided he was going to go over there and deal with it. So he goes over there, climbs up over a balcony, enters through some back or different entrance, goes into the apartment, grabs a gun, goes out the front door of the apartment and confronts *** Moon. It's a very quick confrontation where on video it lasts a matter of seconds, and then the defendant I believe returns into the apartment. It's only a three-second video that shows the defendant with the firearm, puts it behind his back, and back into the apartment, and then the police are called. Police respond, and the defendant ultimately gets arrested because of the video showing him in possession of a firearm. This

offense would not have occurred had the defendant not returned to the apartment.

The police should have been called and that would have been the end of it, but that's not what happened. The defendant returned, grabbed a gun, and confronted the victim, not the victim, but the mother of his children. It cannot be said that the defendant was without blame in occasioning or developing the situation because he drove across town in essence to confront her. Whenever the intent to grab the gun developed doesn't matter, but the fact of the matter is he was nowhere near that location, he returned to the location when he found out she was there, climbed in a back window, grabbed a gun, confronted her through the front door. Let's say he had just returned to the apartment, or he had been in the apartment when she got there, even the act of opening the door and confronting her would add, especially if you're in possession of a firearm, would reasonably be construed as developing or occasioning the situation to escalate. It cannot be found that even with the prior incidents, with all the prior incidents it would be more reason to believe that the defendant wouldn't risk any confrontation with her, he would just call the police and let them deal with it.

So the Court finds that the evidence in this case is such that the defendant is not without blame in occasioning or developing the situation, that his conduct was not necessary to avoid a public or private injury greater than the injury which might reasonably result in the conduct, and the Court is going to deny the request for the necessity defense. So, defense tendered instruction number 1 is going to be denied."

¶ 65    The jury was not instructed as to any affirmative defense. The jury submitted

several questions while deliberating, all of which were answered by the trial court with defense counsel's agreement to the court's responses. One question submitted by the jury was, "Can a felon have a gun if [he is] in danger?"

¶ 66      Ultimately, the jury found defendant guilty of UPWF as charged in count I but not guilty as charged in count II.

¶ 67                                        C. Sentencing

¶ 68      In January 2024, defendant filed a posttrial motion, arguing, among other things, that the trial court erred by denying his request to instruct the jury on the necessity defense.

¶ 69      In March 2024, following a hearing, the trial court denied defendant's motion. Later that month, the court conducted defendant's sentencing hearing. At the beginning of the hearing, the court stated that it had received a presentence investigation report (PSI) filed in January 2024.

¶ 70      The State presented no evidence in aggravation but asked the trial court to take judicial notice of the court files from defendant's past two felonies, which the court did. The State recommended a 10-year prison term, emphasizing his lengthy history of criminal activity and the serious harm that he threatened to Moon and others by confronting her with a loaded firearm.

¶ 71      Defendant argued that his conduct was not threatening, asserting that he merely possessed the firearm; he did not discharge it, raise it at Moon, or make any threats. He asked for the minimum of two years in prison given the mitigating factors present.

¶ 72      Defendant gave the following statement in allocution:

            "I agree with my attorney that I never meant to harm anybody and I do
            take responsibility because I'm a man. At the end of the day right or wrong all I

did was try to live so I can be old and grey and that I can see my kids again and take care of them. I'm a great father, I'm a great person with a great heart, and I don't mind working. Previously I had—was into real estate. I'm not as far as a bad guy or try to be. One thing is I'm big on family, big on respect, and I'm big on protecting me and my family.

So I understand it's the Court's decision. I understand rules is rules, the law is law, but I just hope for the best, man."

¶ 73    The trial court then gave its sentence and reasoning. The court stated that it had considered the PSI, the proffers and arguments of the parties, and the statutory factors in aggravation and mitigation. Regarding the PSI, the court noted that defendant made a comment in the PSI that he wanted to move on from Moon, but she put him in jail. The court explained that there was no doubt that their relationship was very toxic based on the prior incidents between them, but on June 30, 2023, instead of calling the police officers again, as he had earlier that evening, when Moon returned, defendant decided to travel back to the apartment, borrow a loaded gun, and "try to deal with it" himself. The court disagreed with defendant's comment in the PSI, stating, "[S]he didn't put you in jail. When you grabbed the gun you put yourself in jail." The court found that there was no doubt that defendant's conduct threatened serious harm and, given his criminal history, a sentence was necessary to deter others from committing the same offense. In mitigation, the court noted that defendant did care about his children and wanted to work.

¶ 74    Ultimately, the trial court sentenced defendant to 9 years in prison, to be served at 50%, with credit for 252 days of time served in the county jail.

¶ 75    Defendant subsequently filed a motion to reconsider his sentence, arguing that the

sentence was excessive, which the trial court denied.

¶ 76          This appeal followed.

¶ 77                                II. ANALYSIS

¶ 78          Defendant appeals, arguing the trial court abused its discretion by (1) refusing to instruct the jury on the necessity defense and (2) imposing an excessive nine-year prison sentence. We affirm.

¶ 79                         A. The Necessity Instruction Decision

¶ 80          Defendant argues that the trial court erred when it declined to instruct the jury on the necessity defense because there was some evidence warranting the instruction.

¶ 81                         1. *The Applicable Law and Standard of Review*

¶ 82          Criminal defendants are entitled to have the jury instructed on any defense theory, so long as there exists at least slight evidence in support of the theory. *People v. Brown*, 2017 IL App (3d) 140921, ¶ 22. A trial court's determination that the evidence was insufficient to justify the giving of an instruction is reviewed for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Sloan*, 2024 IL 129676, ¶ 15.

¶ 83          Sections 7-13 and 7-14 of the Criminal Code of 2012 provide that necessity is an affirmative defense to a criminal offense. 720 ILCS 5/7-13, 7-14 (West 2022). Section 7-13 specifically provides:

              "Conduct which would otherwise be an offense is justifiable by reason of

              necessity if the accused was without blame in occasioning or developing the

              situation and reasonably believed such conduct was necessary to avoid a public or

private injury greater than the injury which might reasonably result from his own conduct." *Id.* § 7-13.

¶ 84 The necessity defense "is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law." *Janik*, 127 Ill. 2d at 399. For the defense to apply, "the threat of harm must be 'specific and immediate.' " *People v. Taylor*, 2023 IL App (4th) 220381, ¶ 65 (quoting *People v. Kite*, 153 Ill. 2d 40, 45 (1992)); see *People v. Guja*, 2016 IL App (1st) 140046, ¶ 47 ("The defense of necessity applies when the threat of harm was immediate and defendant's conduct was the sole option to avoid injury.").

¶ 85                                     2. *This Case*

¶ 86 Here, we conclude that the trial court did not abuse its discretion by finding insufficient grounds to warrant a necessity instruction. The affirmative defense of necessity is available only when "(1) the defendant was without blame in occasioning or developing the situation and (2) the defendant reasonably believed that [his] conduct was necessary to avoid a public or private injury greater than the injury that might have resulted from literal compliance with the law." *People v. Kratovil*, 351 Ill. App. 3d 1023, 1033 (2004). The evidence presented here failed to satisfy either of these requirements.

¶ 87 First, as the trial court correctly determined, defendant was not blameless in developing the situation. His own testimony revealed that he was situated in a safe location a significant distance—10 to 15 minutes away—from Frazier's apartment, where Moon was reportedly causing a disturbance. Defendant did not simply return home to an unavoidable confrontation outside the apartment. Instead, he chose to return at Frazier's prompting

specifically to confront Moon. Once there, recognizing the possibility of a physical altercation, he deliberately chose to reenter the apartment through a second-story window and then acquired a gun to facilitate his safely confronting Moon. None of this needed to transpire, and defendant never would have come into possession of a gun had he simply not returned to the apartment and instead called the police, something he did earlier that same day with a positive outcome.

¶ 88　　　　Second, the evidence unequivocally shows that defendant's belief that his possession of a gun to confront Moon was necessary to avoid a greater injury than might have resulted from his literal compliance with the law was unreasonable. "Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances." *Id.* at 1034; see *People v. Boston*, 2016 IL App (1st) 133497, ¶ 39 (a necessity defense applies only when the "defendant's conduct was the sole option to avoid injury").

¶ 89　　　　As the trial court found, defendant faced no threat when Moon arrived because he was not in the apartment, nor did he face any immediate threat after he climbed into the apartment through the window. Defendant's belief about the danger Moon posed to the occupants was speculative, as was his assumption that she had companions. Significantly, we have no indication that Moon was even aware that defendant was present prior to defendant confronting her. Even if Moon harbored some intent to harm defendant or Frazier, the testimony showed that the locked apartment door was sufficient to prevent Moon from entering.

¶ 90　　　　Despite these circumstances, defendant chose to personally confront Moon with a firearm instead of contacting the police or allowing Frazier and Brown to handle the situation. Because nothing in the evidence shows that other legal options were not foreclosed to defendant and his testimony unequivocally establishes that he simply chose not to pursue those other

options, we conclude that the trial court did not abuse its discretion by declining to give the jury instructions on the necessity defense. See *People v. Legoo*, 2020 IL 124965, ¶ 34 (noting that the defendant, a sex offender, could not rely on the necessity defense to enter a public park to retrieve his son where other options, including calling the police for assistance, were available to him).

¶ 91 We note that defendant argues that the jury's inquiry, "Can a felon have a gun if in danger?" indicates that there was at least some evidence supporting a necessity defense. We disagree. Although that question indicates some curiosity by the jury about whether a necessity defense was a consideration, that question does not alter the trial evidence or establish that the evidence met the legal threshold to support a necessity instruction. Whether the necessity instruction was appropriate was within the trial court's discretion, and it is presumed to know the law and to apply it appropriately. See *People v. Cummings*, 2023 IL App (1st) 220520, ¶ 33.

¶ 92 Defendant also compares this case to *People v. Ferree*, 221 Ill. App. 3d 212 (1991), and *People v. Crowder*, 2018 IL App (1st) 161226. However, both cases are factually distinct from the present one.

¶ 93 *Ferree* involved a prisoner's possession of a shank in order to protect himself from an immediate attack by members of the Latin Kings gang when the cell doors were opened. *Ferree*, 221 Ill. App. 3d at 217. The defendant testified that he had left the Latin Kings, and shortly before the doors to his prison cell were to open for mealtime, a note was thrown into his cell, which stated, "I know your pretty a*** no longer belongs to the kings, so when the doors roll, your a*** is mine, Punk." *Id.* at 214. "He took the note seriously because he had observed one inmate killed, supposedly by the Latin Kings." *Id.* at 215. The defendant testified that he had no time to report the threat to authorities because there was only a single, unarmed, and

inaccessible guard down the hall. *Id.* On appeal, given the immediacy of the situation, the appellate court concluded that there was at least some evidence supporting necessity. *Id.* at 217.

¶ 94    In *Crowder*, the defendant and his 73-year-old father went to the defendant's estranged wife's home to retrieve his daughter's clothing. *Crowder*, 2018 IL App (1st) 161226, ¶ 5. When they arrived, three men confronted them at the door and, without provocation, one of the men punched the defendant and his father, causing his father to fall off the porch and suffer injuries. *Id.* ¶ 7. The men continued making threats, including that they would shoot the defendant. *Id.* ¶ 8. The defendant, seeing what he believed was a weapon bulge on one of the men and fearing for his and his father's safety, grabbed his father's legally owned handgun and fired one shot into the air before fleeing. *Id.* ¶ 8. He was arrested minutes later and cooperated with police. *Id.* ¶ 10. Following a bench trial, the court found the defendant guilty of aggravated unlawful use of a weapon predicated on his unauthorized possession of the handgun. *Id.* ¶ 14. On appeal, the appellate court reversed his conviction, holding that "no rational trier of fact could find the State carried its burden with respect to negating either the defense of self defense or the defense of necessity, based on the undisputed evidence presented at trial." *Id.* ¶ 35.

¶ 95    Unlike those cases, defendant here was far removed from the immediate situation and had readily available alternatives to avoid a confrontation, such as simply contacting law enforcement from his location away from the apartment or, once inside the apartment, keeping the door locked and waiting for law enforcement to arrive. The circumstances lacked the same level of exigency, and defendant was not without other means of avoiding exacerbating the situation.

¶ 96    We conclude that the trial court did not err by declining to give the jury instruction on necessity.

¶ 97                                B. Defendant's Sentence

¶ 98          Defendant also argues that his nine-year sentence was an abuse of discretion

given (1) the nonviolent nature of the offense, (2) his expressed remorse, (3) the significant

period of time since his last violent offense, (4) his record of consistent employment, and (5) the

detrimental effect that incarceration would have on his children.

¶ 99                       1. *The Applicable Law and Standard of Review*

¶ 100         A trial court's sentencing decision that falls within the statutory sentencing range

is entitled to great deference and generally will not be disturbed on appeal absent an abuse of

discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The role of a reviewing court is not

to reweigh sentencing factors or substitute its own judgment for that of the trial court. *People v.*

*Klein*, 2022 IL App (4th) 200599, ¶ 37. "A sentence within statutory limits will not be deemed

excessive and an abuse of the court's discretion unless it is 'greatly at variance with the spirit and

purpose of the law or manifestly disproportionate to the nature of the offense.' " *People v. Pina*,

2019 IL App (4th) 170614, ¶ 20 (quoting *People v. Fern*, 189 Ill. 2d 48, 54 (1999)).

¶ 101         We afford this deference to trial courts because they are in the best position to

determine an appropriate sentence, having had the opportunity to observe the defendant's

characteristics, credibility, and demeanor firsthand. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

A sentencing court is not required to explicitly state every factor it considered when imposing

the sentence. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. We presume that the court has

considered all relevant sentencing factors and mitigating evidence. *Id.* To overcome this

presumption, the defendant must affirmatively demonstrate that the trial court failed to consider

these factors. *Id.*

¶ 102         In this case, defendant was subject to a statutory sentencing range of 2 to 10 years

in prison. See 720 ILCS 5/24-1.1(e) (West 2022).

¶ 103                                      2. *This Case*

¶ 104        Defendant's argument is essentially a request for this court to reweigh the

sentencing factors and substitute our judgment for that of the trial court, which is not our role.

*Klein*, 2022 IL App (4th) 200599, ¶ 37.

¶ 105        Defendant contends that his nine-year sentence—just one year short of the

maximum—is disproportionate to his conduct. He argues that the offense was nonviolent, that he

never threatened anyone with the gun, and that he made a calculated decision to use the weapon

given his past interactions with Moon, police response time, and his need for self-protection.

Defendant emphasizes that courts must consider the seriousness of the crime and the degree of

harm the defendant caused when fashioning an appropriate sentence.

¶ 106        However, defendant did not merely possess a gun—the offense for which the trial

court sentenced him. He borrowed the weapon with the express purpose of confronting Moon,

the mother of his children. This act was particularly reckless and dangerous given their history of

mutual violence. Both parties testified that Moon had slashed defendant with a razor blade in an

earlier altercation, and both had sustained injuries from the altercation earlier that evening. By

bringing a firearm, defendant chose to escalate a potentially dangerous situation, even though

Moon gave no indication that she could enter the apartment or cause him harm. Defendant's

actions were shortsighted and the result of a complete lack of critical thinking, which could have

resulted in severe injury or death.

¶ 107        Defendant also argues that he demonstrated rehabilitative potential by avoiding

new convictions between 2017 and 2023, maintaining and seeking employment before his arrest,

providing for his family, and working while in jail. He contends that lengthy imprisonment

would cause undue hardship for his children and that the trial court gave insufficient weight to mitigating evidence, such as his expression of remorse. These arguments, like the others, ultimately ask this court to substitute its judgment for that of the trial court, which we will not do.

¶ 108    We presume the trial court considered all relevant mitigating and aggravating factors, and defendant bears the burden of affirmatively showing, with explicit record evidence, that the trial court failed to consider these factors. Defendant has failed to meet this burden. As the State noted at sentencing, defendant spent most of the last 16 years either incarcerated or under some form of court supervision. Though some time had elapsed between his prior felonies and this offense, the court could properly consider his history of repeatedly offending and failing to complete probationary terms satisfactorily. Although Illinois law provides for "strong consideration" to avoid disrupting the caregiving of young children (730 ILCS 5/5-5-3.1(a)(18)(B) (West 2022)), the record shows that Moon serves as the primary caregiver, and nothing in the record demonstrates that the court failed to consider how the nine-year sentence would affect defendant's children.

¶ 109    Ultimately, we will not second-guess the trial court's decision. Defendant's conduct—possessing a gun with the intent and willingness to use it to intimidate another person—went far beyond simple possession. His decision to introduce a firearm into an already volatile situation, which he could have avoided entirely, demonstrates a dangerous disregard for the safety of others. Given his criminal record and the particular nature of this offense, the court did not abuse its discretion by imposing the nine-year sentence, which falls within the statutory range.

¶ 110    III. CONCLUSION

¶ 111        For the reasons stated, we affirm the trial court's judgment.

¶ 112        Affirmed.